THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LUTHER GRAHAM, Defendant-Appellant.

First District (4th Division) No. 76-1039

Opinion filed May 18, 1978.

James J. Doherty, Public Defender, of Chicago (Sam Majerowicz and Leonard V. Solomon, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, James S. Veldman, and Mark E. Rakoczy, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

The defendant, Luther Graham, was charged by indictment with rape (Ill. Rev. Stat. 1971, ch. 38, par. 11—1), indecent liberties with a child (Ill. Rev. Stat. 1971, ch. 38, par. 11—4), contributing to the sexual delinquency of a child (Ill. Rev. Stat. 1971, ch. 38, par. 11—5), and two counts of aggravated kidnapping (Ill. Rev. Stat. 1971, ch. 38, par. 10—2). After a jury trial, the defendant was found guilty of both counts of aggravated kidnapping, rape, and indecent liberties with a child. The court vacated the judgment on one count of aggravated kidnapping, and indecent liberties with a child. The defendant was sentenced to 7 to 21 years, concurrently, in the Illinois State Penitentiary for one count of aggravated kidnapping and rape. From that judgment of conviction and sentence, the defendant appeals.

We affirm.

The facts adduced at the motion to suppress the evidence hearing are as follows:

Police officer John Tomasetti testified that on November 19, 1973, he had a conversation with rape victim, Christine Pietras. She related to him the facts of the incident, the fact that she was tied up with rope in the basement of a single-dwelling residence, and a description of the location of the residence. About 20 minutes later, he went to a residence at 737 North St. Louis. Other officers had already arrested the defendant on the first floor of the house, in either the living room or bedroom. The officer further stated that he and Officer Bolling then proceeded directly to the basement of the house where they recovered some rope. He continued that the physical layout of the basement corresponded to the description the victim gave him, including the fact that she left the basement door

open slightly when she escaped. The officers did not have a search warrant. The basement was the only area of the house searched. The judge ruled that the search was reasonable and denied defendant's motion.

At the trial, the victim, Christine Pietras, was the first to testify for the State. She related the following facts: Around 7:50 a.m., on November 19, 1973, she left for Our Lady of Angels School, located at Hamlin and Iowa Streets, where she was enrolled. On that date, she was 13 years old and resided at 903 North Homan, Chicago, Illinois. As she approached Iowa and Trumbull Streets, the defendant came up to her, armed with a knife, and ordered her to come home with him. She related that she never saw the defendant before nor did she want to go with him. He took her down St. Louis Street past Chicago Avenue and into an alley that was behind some stores, and then proceeded down the alley until they arrived at the back of the defendant's house. Christine observed a light-colored "abandoned car" that had no tires and no license plates. The defendant took her up the back stairs of the house. They entered the kitchen, he put her lunch bag on the table, and then proceeded to the living room where he ordered her to take off her clothes. She refused. He slapped and punched her on the left side of her face, causing her to cry. He again ordered her to undress, and this time she complied.

Defendant Graham told her to go into the adjacent bedroom and get into the bed. He removed his clothes and had sexual intercourse with her. She stated that she experienced pain in her vagina during the act of intercourse. Subsequently, he dressed and told her to put on all of her clothes except her underpants. He next took her downstairs to the basement where he tied her hands and legs to an oil tank with rope and her neck to a door knob with wire. He loosened her feet a little, picked up her skirt, and had intercourse with her again. Upon withdrawing, he tightened the rope around her feet. He then went upstairs and left her in the basement.

Sometime later, the defendant came back to the basement, partially untied Christine, and took her upstairs into the kitchen. He asked her where she wanted to have intercourse this time. Christine testified that she picked the couch in the front room. On the defendant's command, she lay down on the couch where the defendant, completely naked, again had sexual intercourse with her. After awhile, the defendant fell asleep, but soon awoke when he fell off the couch onto the floor. Upon awakening, the defendant once again had sexual intercourse with Christine.

The victim testified that the defendant then took her back into the basement, tied her up again, and went back upstairs. She lay on the basement floor until dark, at which time she heard men's voices upstairs.

She did not scream until she heard a lady's voice. When no one answered her screams, she attempted to untie herself. She soon worked herself free and then ran out of the basement door, leaving it slightly ajar.

As Christine was running, she saw her girl friend, Belinda Cerilli, and told her what had happened. Belinda's parents took her into their house and called the police. When the police arrived, Christine related what had transpired and then accompanied the police to her own home one block away. More police arrived at her home. She again related the incident, describing her assailant as approximately 5 feet 9 inches to 6 feet in height, with curlers in his hair, and wearing a coat and purple hat. Thereafter, she led the police to the house where she had been raped. She stated that she was able to pick out the defendant's house because she recognized the "abandoned car" in the backyard and the rear of the house. One of the officers knocked on the front door and a lady answered, letting them in. She observed the defendant sleeping in the first floor bedroom and told the police "that's the man." She noticed that the defendant still had curlers in his hair. She then led the policemen down to the basement and showed them where she had been tied up. She recognized the rope, oil tank, rags, wire, and the basement door ajar. She observed the police remove the rope from the basement, which she identified at trial.

Christine further testified that she was then taken to the hospital where a doctor examined her. The left side of her face was swollen, and her left eye area was bruised. She had rope burns on her wrists, legs, and neck.

At trial, Officer John Tomasetti testified that on November 19, 1973, he received an assignment at 6:45 p.m. and proceeded to 900 North Trumbull Avenue, the residence of the Cerilli family. Christine Pietras told him she had been raped. Christine's clothing was in a state of disarray, and she was very sick. The left side of her face was bruised, and she had red lines around her neck and both wrists. She stated that the rape occurred in a house that had an abandoned automobile in its backyard, and that its fence was knocked down. He, his partner, and Christine next went to the Pietras' residence where they met a number of other policemen. From Christine's house, he went to the defendant's house where he observed a light-colored abandoned automobile in the backyard that looked inoperable, a broken-down fence, and the basement door ajar. Upon entering the defendant's house, he noticed that the defendant had pink curlers in his hair. He, Officer Bolling, and Christine then went into the basement and observed a large tank, rags strewn about the floor, rope, and plastic cord. Officer Bolling took the rope. He and his partner then took Christine to the hospital.

Officer Horace Bridges' testimony was substantially the same as that of Officer Tomasetti. He added that Christine led him to and pointed out the

defendant's house. He knocked at the front door and a woman invited him in. She turned on the light in a bedroom adjacent to the living room. The officer woke the defendant who was in bed. Christine positively identified the defendant as her assailant. He advised the defendant of his rights after arresting him. The defendant had pink curlers in his hair which were removed by his wife while she and defendant were in the squad car.

Officer Bolling also testified, substantially corroborating the testimony of Officers Tomasetti and Bridges. He added that someone mentioned Christine had been gagged.

Dr. Tonse Raju testified that on November 19, 1973, he was working at Cook County Hospital where he had occasion to examine Christine Pietras. He made an external examination and found a slap mark on her left cheek and two parallel reddish marks on each wrist and ankle. He also conducted a genital examination and discovered that there were no marks on the thigh, but that there was a recent, small wound to the victim's hymen, with a slight ooze of blood from the wound. No spermatozoa was found.

The last witnesses for the prosecution were Investigators James Cornelison and Ronald Goscinski. After speaking to Officers Bridges and Bolling at the 11th district station on the same date, they talked to Luther Graham in the lockup. The defendant first contended that he did not commit the rape of Christine Pietras, but later admitted: "Hell, yes, I did it. * * * I'm going to plead guilty to it."

The defendant took the stand as the sole defense witness. He testified that during November 1973, he was employed at the Best Line Casting Company, Monday through Saturday, from 6 a.m. to 2:30 p.m. On November 19, 1973, he resided at 737 North St. Louis with his common-law wife, Loretta Jones, and their two young children. On the day in question, Loretta woke him at approximately 5:45 a.m. because his cousin, Henry Greer, was there to pick him up for work. He told Greer that he was not going to work that day and he went back to sleep.

He was again awakened around 8:30 a.m. by his friend, Governor Nugen. They went to a local grocery store where the defendant purchased a half pint of "C.C." They drank the half pint in an alley behind a nearby pool hall. Having finished the contents of the bottle, they returned to the store for another half pint. They went back to the alley and consumed the liquor. While the two were drinking the second half pint, a number of their friends came by with a fifth of Richards. After finishing all the liquor, he telephoned the president of Best Line and then went back home while Nugen went home to take care of his dog.

Nugen came back in about 10 minutes, whereupon the two walked to a

restaurant where a friend was employed as a janitor. They bought some more liquor and sat drinking in the restaurant for approximately 1½ hours. The defendant then went home.

Henry Greer came over to defendant's house around 1:35 p.m., having left work early due to a work slowdown. They went to the Subscription Lounge and had a couple of beers. Defendant and Greer then purchased a six-pack of beer and a half pint of "C.C." and, accompanied by Nugen, went back to defendant's house. Greer left around 3:15 p.m. Loretta arrived home around 4:30 or 4:45 p.m. and Nugen left. He talked to Loretta for about a half hour and then they had sex. Subsequently, he went to sleep. Sometime later, he was awakened by Officer Bridges who stood over him with a .38 Magnum gun pointed at him. He only had on a silk T-shirt and was not wearing curlers in his hair. Bridges told him to get dressed. Defendant got his housecoat and went upstairs to his bedroom to dress. After dressing, he went to the basement with Officers Bridges and Bolling, and Loretta. Bolling retrieved a cord used as a clothes line which defendant had taken down previously.

The defendant stated that he was then taken to the 11th district police station but denied ever admitting his guilt to Investigators Cornelison and Goscinski.

The defendant denied having curlers in his hair on that day, denied owning a purple hat, and stated that he did not abduct nor rape the victim. He first said that the fence in his backyard was up and on cross-examination could not remember if the fence was up or not. He said his car was operable and had tires. He testified that he generally did not go to work on Mondays.

In rebuttal, Dorothy Field, owner and manager of the Best Line Die Casting Company, testified that the defendant was employed by her company from October 12 to November 16, 1973, missing work on one Monday and working only one Saturday. She further testified that Henry Greer (defendant's cousin), on November 19, 1973, worked from 5:54 a.m. to 2:30 p.m., there being no work shortage that day which would have caused her to dismiss him early.

Officer James Antonacci testified that he and Bridges arrested Graham in his bedroom, and that at that time he had no clothes on and, specifically, that he was not wearing a silk T-shirt. The defendant dressed in that room, putting on a purple T-shirt. He did not get his clothes from the second floor. No gun was drawn by the officers when they arrested him in the bedroom.

The issues presented for review are (1) whether the warrantless search of defendant's basement was incidental to an arrest or made under exigent circumstances, and, if not, did the court err in failing to suppress the fruit of the search; (2) whether the defendant was proved guilty

beyond a reasonable doubt; and (3) whether the court erred in imposing judgment and sentence on both aggravated kidnapping and rape.

Defendant argues that the court erred in denying his motion to suppress the evidence obtained in a warrantless search of the basement of his house because the State failed to prove that the search was incidental to an arrest, made with consent, or based on probable cause where exigent circumstances made it impractical to obtain a warrant. He relies on *Chimel v. California* (1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034, and *People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681, to support his arguments.

The People submit that the trial court's ruling was correct in light of the exigent circumstances, or, in the alternative, that the ruling constitutes harmless error.

The People point out that the police were recently informed of the facts of the rape, quickly went to the defendant's house, arrested the defendant, and only searched the basement for the ropes. The State claims that under these circumstances the search was a limited and specific search calculated to secure evidence which the police had reason to believe was used in the commission of a crime and, thus, a warrantless search was justifiable. The State further argues that if the police would have delayed and obtained a warrant, the defendant's wife probably would have had sufficient time to conceal or destroy all incriminating physical evidence. It concludes that this additional fact also justified the warrantless search.

Alternatively, the State maintains that any error arising from the trial court's denial of defendant's motion to suppress was rendered totally harmless because of the otherwise competent trial evidence which overwhelmingly established beyond a reasonable doubt that the trial court's alleged error did not contribute to the defendant's conviction.

■■ All searches conducted without a valid search warrant are unreasonable unless shown to be within one of the exceptions to the rule that a search must rest upon a valid warrant. (*Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454-55, 468, 29 L. Ed. 2d 564, 576, 584, 91 S. Ct. 2022, 2032, 2039; *People v. Creed* (1975), 34 Ill. App. 3d 282, 284, 339 N.E.2d 305, 307-08.) The record does not show that defendant or his common-law wife consented to the search, so, if at all, it must be justified either as a search incident to arrest (*Chimel v. California* (1969), 395 U.S. 752, 762-63, 23 L. Ed. 2d 685, 694, 89 S. Ct. 2034, 2040; *People v. Williams* (1974), 57 Ill. 2d 239, 243, 311 N.E.2d 681, 684), or as a search made with probable cause and under exceptional or "exigent" circumstances (*People v. Hering* (1975), 27 Ill. App. 3d 936, 940-41, 327 N.E.2d 583, 588).

The State has failed to meet its burden of proof with regard to both of these exceptions.

■■ Regarding the first of these exceptions, the rule is that a warrantless search incident to an arrest may be made of the defendant's person plus the area within his immediate control from which he might obtain either a weapon or an evidentiary item. (*Chimel*, at 763; *Williams*, at 243.) The defendant was arrested in either his bedroom or the front room of his house on the first floor. Clearly, the basement of the defendant's residence was not an "area within his immediate control."

As to the second exception, the thrust of the State's argument is that if the police would have taken additional time to obtain a warrant, the defendant's wife would have had sufficient time to conceal or destroy all incriminating physical evidence. It concludes that exigent circumstances existed as to justify the immediate search of the basement without a warrant. An examination of the record does not disclose that the defendant's wife knew anything about the rope in question. There is no indication that the victim mentioned the existence or location of the ropes in the presence of defendant's wife; in fact, the officer who performed the search testified that he learned about the ropes when he initially questioned the victim *outside* the defendant's house. Nor does the record indicate that the police were apprehensive regarding the defendant's wife. Thus, the State failed to meet its burden of proof. We now turn to the People's alternative argument regarding harmless error.

■■ There are some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction. (*Chapman v. California* (1967), 386 U.S. 18, 22, 17 L. Ed. 2d 705, 709, 87 S. Ct. 824, 827; *People v. Smith* (1973), 15 Ill. App. 3d 10, 14, 304 N.E.2d 50, 54.) Before a reviewing court may hold that a constitutional error is harmless, it must be able to declare a belief that the error was harmless beyond a reasonable doubt. *Chapman*, at 23-24; *Smith*, at 14.

■■ We must determine on the basis of "our own reading of the record and on what seems to us to have been the probable impact * * * on the minds of an average jury" (*Harrington v. California* (1969), 395 U.S. 250, 254, 23 L. Ed. 2d 284, 288, 89 S. Ct. 1726, 1728), whether the admission of the rope and wire was sufficiently prejudicial to the defendant as to require reversal. Unless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required. (*Fahy v. Connecticut* (1963), 375 U.S. 85, 86-87, 11 L. Ed. 2d 171, 173, 84 S. Ct. 229, 230.) Constitutional errors relating to search and seizure can be harmless where the case against defendant was not woven from circumstantial evidence. (See *Harrington*, at 254.) While it is true that Christine Pietras was the only eyewitness to the illicit acts, corroboration is found in the actions of the complaining witness following

the incident. Immediately after her escape, she informed the police of the circumstances surrounding the rape and led them directly to the defendant's house where she recognized the abandoned car in the backyard and other distinguishing features of the house. She related that she had been tied up in the basement and escaped, leaving the door slightly ajar. She satisfactorily answered the questions put to her by the attorneys. She had ample opportunity to observe the defendant and she positively identified him as her assailant at the defendant's house and in court. She described his appearance and said he had pink curlers in his hair. Testimony of one witness alone, if it is positive and the witness is credible, is sufficient to convict. (*People v. Miller* (1964), 30 Ill. 2d 110, 113, 195 N.E.2d 694, 697.) Additionally, Christine's testimony was corroborated by several other witnesses. Officer Tomasetti testified that on the day in question he observed that Christine was very sick and noticed red lines around her neck and wrists. He corroborated her description of the defendant and of the defendant's house. The other officers' testimonies were substantially the same.

Dr. Raju observed reddish marks on both wrists and ankles of Christine, a slap mark on her left cheek, and a recent wound to her hymen.

The investigators testified that the defendant admitted his guilt of the crime. Much of the defendant's testimony was impeached by his employer and the police officers.

■■ The evidence establishing the defendant's guilt is overwhelming, and, thus, we conclude that the minds of an average jury would not have found the State's case significantly less persuasive had the rope and wire been excluded. See cases discussed in Annot., 30 A.L.R.3d 128, 167-71 (1970).

The defendant next contends that he was not proved guilty beyond a reasonable doubt because (1) the evidence concerning penetration was weak and improbable, (2) the State failed to introduce corroborative physical evidence which casts doubt on the defendant's guilt, and (3) the victim's testimony was contradictory and not believable.

The State argues that the evidence concerning penetration was clear and convincing. Failure to introduce corroborating physical evidence did not raise a reasonable doubt of the defendant's guilt and, at most, raises a question of the credibility and weight to be given the State's evidence, and that the testimony of the victim was clear and convincing. The State concludes that the defendant was proved guilty beyond a reasonable doubt.

Where there is some proof of penetration, it is a question of fact whether it occurred. (*In re Williams* (1974), 24 Ill. App. 3d 593, 598, 321 N.E.2d 281, 284.) In *Williams*, the court found the complaining witness'

testimony that one youth put his penis in her vagina and later penetrated her vagina was sufficient to permit the trial court's conclusion that penetration with the penis had occurred.

Herein, although the victim had a limited medical and sexual vocabulary, she clearly established what had happened to her. On redirect, she testified that she did not have one of those "things" that came out of the defendant's pants. She knew the defendant put the "thing" inside of her because she could feel it. The "thing" was "standing straight" immediately before he put it into her vagina. She indicated that her vagina was located on the "lower bottom" of her body where she has her menstrual period.

The defendant also argues that absence of spermatozoa and lack of substantial damage to the victim's genital area indicate that penetration was not proved beyond a reasonable doubt.

■■ The absence of spermatozoa and the lack of vaginal bleeding do not establish that the victim's testimony relating to penetration is unbelievable as a matter of law. *People v. Hood* (1973), 11 Ill. App. 3d 329, 334-35, 296 N.E.2d 393, 398, *aff'd & remanded* (1974), 59 Ill. 2d 315, 324, 319 N.E.2d 802, 808.

Dr. Raju's testimony as to lack of spermatozoa, and his testimony regarding the physical condition of the victim and the small, recent wound to her hymen, was testimony for the jury to weigh in determining the guilt or innocence of the defendant.

■■ We conclude that sufficient evidence was presented to support the finding of penetration.

The failure of the State to present evidence available to it may be considered in viewing the credibility of the evidence, but argument based upon such a circumstance is better presented to the trier of fact, which is charged with the duty of weighing and evaluating the evidence, than to a reviewing court. *People v. King* (1972), 4 Ill. App. 3d 1066, 1071, 282 N.E.2d 746, 750.

In closing argument, the defense commented on the absence of the curlers and the rags used to gag Christine, but failed to comment on the absence of the knife, defendant's purple hat, Christine's lunch bag, and Investigator Cornelison's notes. Defendant argues that the absence of this corroborative physical evidence creates an unfavorable inference which casts a reasonable doubt on defendant's guilt.

■■ It is not clear from the record whether any of the physical evidence not admitted was available to the State. Even if the evidence was available, the failure of the prosecution to introduce it would go to the credibility and weight of the State's evidence, but would not *per se* raise a reasonable doubt as to the defendant's guilt.

Next, defendant argues that the complaining witness' testimony was

weak and contradictory and insufficient to prove him guilty beyond a reasonable doubt.

■■ It has long been held that the testimony of the victim alone is sufficient to support a conviction for rape where that testimony is found to be clear and convincing (*People v. Davis* (1957), 10 Ill. 2d 430, 442, 140 N.E.2d 675, 683), even when contradicted by the accused. (*People v. Henley* (1976), 36 Ill. App. 3d 223, 226, 343 N.E.2d 656, 658.) Clear and convincing evidence, however, is not synonymous with uncontradicted or unimpeached testimony. Minor variances in the testimony may occur, and, if so, these variances constitute mere discrepancies going only to credibility. (*People v. Jackson* (1963), 28 Ill. 2d 566, 571, 192 N.E.2d 873, 876; *People v. Wright* (1972), 3 Ill. App. 3d 829, 833, 279 N.E.2d 398, 401.) It is the task of the trier of fact to weigh these discrepancies, and, if it is found that the discrepancies are so minor as not to detract from the reasonableness of the victim's story as a whole, her testimony may be found clear and convincing. (*People v. Brown* (1963), 29 Ill. 2d 375, 378, 194 N.E.2d 326, 328; *People v. Brown* (1975), 32 Ill. App. 3d 182, 187, 336 N.E.2d 523, 527.) When the testimony of the complaining witness is not clear and convincing, corroboration by other facts or evidence is required to sustain a conviction; a prompt complaint has been held to constitute sufficient corroboration. *Henley*, at 226.

As noted earlier, Christine's testimony does demonstrate a limited medical and sexual vocabulary on her part. The record also reflects that she was confused about directions and the location of the defendant's house and could not recollect all details regarding defendant's description, the abandoned car, defendant's house, and the knife. However, these variations are minor and on the whole her testimony is uncontradicted and convincing. She had adequate opportunity to observe defendant and his house. She led the police directly to the defendant's house and positively identified him as her assailant. Even assuming *arguendo* that her testimony is not clear and convincing, her testimony was corroborated by a prompt complaint to the police and by several other witnesses which would be sufficient to sustain defendant's conviction. The evidence presented at trial and taken as a whole clearly established the defendant's guilt.

■■ The essence of defendant's final argument is that rape is a lesser-included offense of aggravated kidnapping based on rape, and, therefore, the trial court erred in imposing judgment and sentence on both aggravated kidnapping and rape. This issue has been resolved by the recent decision in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838. The supreme court in *King* affirmed convictions for rape and burglary and held "that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition,

lesser included offenses, convictions with concurrent sentences can be entered." (*King*, at 566.) Applying the holding to the instant case, it follows that the offenses of rape and aggravated kidnapping arose from a series of incidental or closely related acts and are not lesser-included offenses. (*People v. Richardson* (1977), 50 Ill. App. 3d 550, 559, 365 N.E.2d 603, 609; *People v. Carroll* (1977), 49 Ill. App. 3d 387, 395, 364 N.E.2d 408, 415.) Consequently, the convictions for aggravated kidnapping and rape were properly entered by the trial court.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DIERINGER and LINN, JJ., concur.