THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. AARON WALKER, JR., Defendant-Appellant.

Second District    No. 2—85—0884

Opinion filed April 10, 1987.

G. Joseph Weller and Mary Kay Schick, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

The defendant, Aaron Walker, Jr., was charged with aggravated criminal sexual assault. (Ill. Rev. Stat. 1985, ch. 38, pars. 12—14(a)(3), 12—14(a)(4).) After a jury trial, the defendant was found guilty, and he was sentenced to six years' imprisonment. On appeal, he challenges the constitutionality of the aggravated criminal sexual assault statute, and he contends that he was not proved guilty beyond a reasonable doubt.

The defendant, at trial, admitted having sexual intercourse with the complainant, but he contended that it was not an act of force, as the complainant was a willing partner.

The complainant, Traci Nazarowski, was a 16-year-old ward of the State of Illinois on May 7, 1985, the time the alleged criminal incident took place. At that time, she had been living at the Fox Valley Group Home (hereinafter home) in Aurora, Illinois, for approximately two months. She attended the Mary A. Todd School for children with behavior disorder problems. The school was located approximately seven or eight blocks from the home.

The complainant testified she left the home at approximately 7:45 a.m. on May 7 and walked to school. She stated that she arrived at school just before 8 a.m., attended two classes, then left school at 10 a.m. to join a friend and get something to eat, intending to skip school the rest of the day. It is undisputed that the defendant, Aaron Walker, Jr., a 27-year-old black male, was driving in the area and, seeing the complainant standing on the street, approached her in his car. The defendant stopped his car, bringing the front passenger door even with the complainant, and asked her, through that open passenger window, what she was doing. She told him she was looking for a friend and accepted his offer to help her look for her friend by driving her around. There is no dispute that the complainant willingly entered the defendant's car. Complainant stated that she had never seen the defendant prior to that day. She said he was dressed in blue jeans and a cut-off sweatshirt. Complainant was also wearing blue jeans, with a red shirt and white moccasins. The complainant estimates they drove around the school area for 10 to 15 minutes without finding her friend.

The complainant testified that during that period, the defendant told her that he was working for the police, in an undercover capacity, and showed her a "mug shot" of Manuel Salazar, whom the police were seeking for the murder of a Joliet policeman. She told him that she thought a friend of hers had dated the man and gave the defendant the friend's name and address. Also during this time,

complainant asked the defendant for a cigarette, and she stated that he opened the glove compartment in the car and offered her a cigarette. At that moment, complainant claims she saw what appeared to be some dark leather object in the glove compartment. Complainant stated that she had already noticed a bullet resting in a small container, a "car caddy," on the floor of the car. She testified that she therefore concluded that the leather object was a gun holster.

Following this 10- to 15-minute period during which complainant explained the defendant remained within a block or two of the school, the defendant flagged down a police officer in a marked squad car. She related that the defendant and policeman spoke for a few minutes. Complainant stated that she thought they were probably discussing the defendant's undercover work. When the defendant got back in the car, they began to drive away from the school. At that time, driving away from the school, complainant testified that she and the defendant made small talk about the information she had given him, her previous high school, some things about her family, and her experiences at the home. She stated that the surrounding area became more rural and that she asked him where they were going. She claims the defendant told her that he wanted to show her something. Sometime during the drive, complainant removed her shoes.

They drove, in the complainant's estimation, for three to four minutes, along roads unfamiliar to the complainant, until they left the main road and pulled down a gravel road into a wooded area. One of the investigating police officers testified that the road traveled was Jericho Road and that it was over two miles along Jericho Road to this gravel road where it would be normally entered if one left from Todd School. Complainant said that there were a series of gardens on one side of the gravel road. The defendant stopped the car and shut off the engine when they reached the end of the gravel road, estimated to be less than a block long by complainant. After he parked the car, he told her he used to play baseball there. At that point, complainant asserts that she told defendant she wanted to go back and that he responded that they weren't leaving until they did something first.

The complainant said she began to get scared and again asked to go back and that upon trying to open the door, the defendant locked it from his side with an automatic door lock and similarly rolled her window up from his side. According to complainant, she started to cry, and defendant told her to shut up and to take her pants off. She said no and asked, "[y]ou aren't going to hurt me, are you?" and

that he responded, "[n]ot unless you have sex with me."

Defendant then allegedly started pulling down the complainant's pants. The complainant said she had her hands on the seat, trying to back away. The defendant allegedly unfastened complainant's belt, unbuttoned and unzipped the complainant's pants, and then pulled them down to her knees. She stated he had little difficulty getting them down. During this time, the complainant stated she was crying very hard and for a time, covered her face with her hand. Complainant testified that the defendant told her to get in the backseat. She said the front seat was one long seat but there was a crack in the seats. The defendant supposedly pulled complainant "a couple of inches" and then "indirectly" pushed her into the backseat. Complainant says the defendant then told her to take off her underwear and then he got out of the car on the driver's side, took off his pants, pulled the seat forward, and climbed into the backseat. Complainant says she removed her underwear while the defendant was outside of the car. She stated that she "thought about maybe I can run away from him. And then it was like, God, if I go he could catch me and be more mad at me and beat me up or something." Complainant stated that she had noticed a "white man" working in one of the gardens alongside the gravel road as they proceeded down that road.

Complainant testified that before defendant had sex with her, she raised herself up so that he could place a towel beneath her. She said that she did not tell defendant she was having her period.

When the defendant allegedly forced himself on her, complainant stated she began crying again and that the defendant "[h]e told me, he said to shut up, and he went like that. [Witness indicating.] Not hard like that, but he just hit like [sic] and to just shut up." She said he backhanded her on the left side of her face.

When the defendant finished, both he and the complainant dressed and got back in the front seat. The defendant then proceeded to drive back to the Todd School and dropped the complainant off by the entrance at the front of the school. Complainant stated she did not think to get the defendant's license number as he drove away, although she did take a bullet from the defendant's car caddy when he wasn't looking, intending to use it as evidence against him. She testified that she knocked on the school door, whereupon an older woman answered. She said nothing to the woman, but walked into the school to the front office. She saw the clock and realizing there was still school left, she turned around and walked back to the home.

Upon arriving at the home, complainant said that Violet Dean, a friend she claims to have known for about three weeks, let her into the home. She said she was crying when she saw Violet and sat down in the living room and that Violet asked her what the problem was right away. Violet would testify that she became a resident of the home the day before, lived at the home only two weeks before leaving, that she first saw the complainant in the dining room, and that over an hour transpired before she approached the complainant about what was bothering her. Violet Dean stated that she thought all of this might have taken place before lunch. After her discussion with Violet Dean, complainant went to her room and slept until 4:30 p.m. or 5 p.m. She then told another friend about the alleged rape and finally a caseworker, whereupon she was taken to the hospital.

The defendant's version of the events of May 7 is at variance with that of the complainant's. His testimony was not materially different from that of the complainant up to the point in time that complainant asked for a cigarette. The defendant testified that he had no cigarettes, but that he was on his way to the home of his cousin, Annette Page. He stated that he drove the 9 to 10 blocks to his cousin's, visited briefly with Annette Page, obtained cigarettes and left. Annette Page would testify that such a visit did take place and that she observed a young white girl in defendant's car at the time. Prior to their arrival at the defendant's cousin's home, the defendant claims he and complainant had already discussed sex and that complainant was willing.

The defendant stated he gave the complainant the cigarettes and began driving again. When the complainant asked the defendant where they were going, he said they were taking Jericho Road, the road leading to the park at which the alleged criminal incident occurred. Shortly thereafter, the defendant related that he flagged down a police officer and that when he did, the complainant grew anxious and asked if the defendant was going to tell the police officer about her. Defendant spoke with the officer telling him he had information for Officer Thomas Hill about Manuel Salazar. Officer Hill testified that the defendant was working with him in the police effort to find Salazar.

Defendant stated he then returned to the car and again set out for Jericho Park. At one intersection, upon encountering an Aurora squad car and paddy wagon, the defendant contends complainant told him to avoid them and to turn in another direction. Defendant stated that as they drove, complainant asked about his daughter, Akila, and asked if he had any pictures. He stated he reached into

the glove compartment, took out his wallet, and produced a picture of his daughter. He also confirmed that complainant had, during this portion of the drive, talked about her father and about conditions at the home.

After making the turn from Jericho Road onto the gravel road, defendant said he noticed a black man tending one of the gardens along the road. Defendant parked at the end of the gravel road and turned the car off. He mentioned to complainant he had played baseball there. Defendant stated complainant told him he had cute eyes, and he then asked her if she was ready. He stated complainant said "[w]ait a minute," and he then got out of the car, walked to the front and urinated. He walked back to the car, and he said complainant had climbed into the backseat and taken her pants off. Complainant allegedly asked defendant if he had anything to put on the seat. He testified he walked to the trunk of the car to get a towel, which he explained he keeps in his trunk for washing and waxing his car, returned to the backseat, and placed the towel under the complainant. The presence of two stacks of towels in defendant's trunk, one clean and one dirty, was confirmed by the subsequent police search of the defendant's vehicle. Defendant stated he then pulled his pants down, in the car, and he and complainant engaged in one act of intercourse.

Upon completion, the defendant testified he looked out the back window of the car and saw a "white man" about 10 to 15 feet behind the car. Defendant stated he ducked, told complainant, and that she leaned up so she could see him and said, "[f]uck that man." It was also at this point that defendant claims he first realized that complainant was menstruating. He used the towel to wipe himself off, as did the complainant. On the return trip to Todd School, defendant stated he threw the towel out the window. Defendant said that, at complainant's request, he dropped complainant off in front of the school and agreed to see her again. He agreed to see her again only to pacify her, with no real intention of following through.

■■ ■ In sex offense cases, courts of review are required to examine the evidence carefully. (*People v. Fuller* (1983), 117 Ill. App. 3d 1026; *People v. Grover* (1983), 116 Ill. App. 3d 116; *People v. Smith* (1982), 111 Ill. App. 3d 895; *People v. Lucien* (1982), 109 Ill. App. 3d 412.) To sustain a conviction for criminal sexual assault, there must be evidence that defendant committed an act of sexual penetration by the use of force or threat of force. (Ill. Rev. Stat. 1985, ch. 38, par. 12–13(a)(1).) The statutory definition of "force or threat of force" is "the use of force or violence, or the threat of

force or violence." (Ill. Rev. Stat. 1985, ch. 38, par. 12—12.) The quantum of force necessary to sustain a conviction is not specified, and each case must therefore be analyzed as to its particular facts. See *People v. Smith* (1965), 32 Ill. 2d 88; *People v. Warren* (1983), 113 Ill. App. 3d 1; *People v. Barbour* (1982), 106 Ill. App. 3d 993; *People v. Walsh* (1980), 80 Ill. App. 3d 754.

On appeal, the defendant emphasizes the significance of several key areas in complainant's testimony. Both Aurora police officer Porter and Kane County sheriff's detective Robert Cannon testified that complainant told them she saw a white male adult working in one of the gardens along the gravel road. Officer Porter stated the complainant said that she turned around and saw the man working in one of the gardens. At trial, complainant testified this person was out of sight but still within two blocks of the parked car.

Detective Cannon, Gloria Butler, a child-care worker at the home, and nurse Becky Steward, who first saw complainant in the emergency room at the hospital, both testified as to the force the defendant allegedly employed to perpetrate the sexual assault. Nurse Steward stated that complainant told her defendant ordered her to take her clothes off, and when she resisted, he threatened her by telling her he had a gun. Complainant said she then relented. Gloria Butler stated that complainant told her that she saw a holster with a gun in defendant's car. Complainant also told Steward the defendant told complainant to shut up, slapped her, and ordered her to take her clothes off. Neither of these threats nor the use of physical force were testified to by complainant at trial as the basis for her decision not to resist the defendant's advances.

Detective Cannon testified that complainant told him she saw a bullet and what she thought was a holster in the defendant's glove compartment and that these objects led her to fear for her physical safety. The defendant testified that the leather object in his glove compartment was his wallet and introduced evidence from two police officers that they had stopped him in the early morning of May 7, 1985, for a traffic offense and that one officer had viewed the inside of the passenger compartment with the glove compartment open. The inference to be drawn is that were there a holster in the glove compartment, the defendant would have been questioned about it by the police. Neither did the police ever find a holster in their search of the car. Further, Detective Cannon testified that complainant told him that prior to intercourse, there was no verbal threat from the defendant of deadly harm.

Detective Cannon stated that complainant said that she had

pleaded and begged defendant not to have sex with her because she was having her period. The complainant's testimony at trial was that she never said anything to the defendant about her period.

Also, regarding the element of force, Officer Porter testified that complainant said the defendant pushed her into the backseat despite her efforts to resist. At trial, complainant described the defendant's actions as pulling her a few inches by her left arm and "indirectly" pushing her into the backseat.

Finally, there is a serious question raised regarding the complainant's credibility from our reading of the record. Although complainant testifies to numerous times, places, and conversations relating to the circumstances surrounding this alleged sexual assault, on at least six occasions, wherein complainant's testimony conflicts with that of the defendant, the complainant responded to the defense counsel's queries by saying that she did not remember. She stated she did not remember (1) going to the home of the cousin of the defendant; (2) defendant's producing his wallet from the glove compartment and showing her a picture of his daughter; (3) seeing the white male in his garden while leaving the scene of the alleged sexual assault; (4) asking defendant why he was flagging down a policeman; (5) defendant's telling her that he did not tell the policeman that she was skipping school; nor (6) begging defendant not to have sex with her because she was menstruating.

In addition, the circumstances attendant to the complainant's contention that she immediately reported the rape by telling Violet Dean, her supposed friend, by complainant's estimation at approximately 10:45 to 11 a.m., that she had been raped are contradicted by complainant's actions and by the testimony of Violet Dean, Tony Lamantia, a senior teacher at Todd School, and Steven Budde, director of Fox Hill Group Home.

Complainant testified, as did the defendant, that she was dropped off by the defendant at the front door of the school. She knocked at the door, was admitted, and said nothing to the school official who opened the door. She walked into the school "[j]ust by the front entrance where you could see the office. I looked at the clock and I seen that there was still school left, and I just said forget it. I turned around and went back home." It is unclear whether complainant intended to return to her classes at that time.

Tony Lamantia, a senior teacher at Todd School, confirmed that the complainant had returned to school. His attendance sheet indicated complainant's school attendance on May 7, 1985, was as follows:

(1) Arrived at school 8:36 a.m.

(2) Left school at 9:00 a.m.

(3) Returned to school at 10:30 a.m.

(4) Left school again at 10:48 a.m.

Such time periods could be seen to be more consistent with the defendant's version of the events of the morning, wherein a stop was made at his cousin's home and in that they took a somewhat roundabout route to Jericho Park. Complainant testified she left school at approximately 10 a.m., which, if true, would be consistent with the time frames that she testified to regarding the time it took to reach the park and to return to the school.

Steven Budde, director of the home, testified that their records showed complainant had not yet returned to the home by noon on May 7, 1985, but that she was in the home by 1 p.m. that day. Budde also testified as to the consequences of complainant's having skipped school: "For being gone from school and not coming back to Fox Hill, she would have received at least two days of restrictions for being gone up to three hours. Could be more." Such testimony casts some doubt about both the versions of Violet Dean and the complainant about when complainant actually returned to the home. Further, we note that the complainant almost certainly faced punishment for having skipped school.

Violet Dean, as mentioned earlier, testified that she first saw complainant in the dining room, not living room; she did not say she let complainant into the home as complainant claims, and she stated it was over an hour after seeing complainant that she asked what was wrong, not upon letting complainant into the home. Finally, complainant's contention that she shared this intimate information with a friend, Violet Dean, is belied by Budde's testimony that Violet Dean had only arrived at the home the day before.

We find the present matter analogous to the situation faced by the court in *People v. Warren* (1983), 113 Ill. App. 3d 1, a sexual assault case where the only evidence as to force was as follows:

> "Complainant testified that when she got on her bicycle, defendant placed his hand on her shoulder. At this time, complainant stated, 'No, I have to go now,' to which defendant responded, 'This will only take a minute. My girlfriend doesn't meet my needs.' Defendant also told her that 'I don't want to hurt you.' " 113 Ill. App. 3d 1, 3.

The State attempted to explain the complainant's lack of resistance in *Warren* by stating complainant was paralyzed with fear. Complainant testified that she didn't try to flee because, "it was in

the middle of the woods and I didn't feel like I could get away from him and I thought he'd kill me." (113 Ill. App. 3d 1, 5.) Also, complainant had seen people in the area but did not scream because she felt they were too far away and screaming "would be bad for me." 113 Ill. App. 3d 1, 5.

Similarly, here complainant presents this court with little evidence as to the defendant's use or threat of force prior to intercourse. Her claim that defendant lightly slapped her during intercourse was not prior to the act and was contradicted by the defendant. We are faced with a situation where, as complainant told Detective Cannon, there were no verbal threats of bodily harm prior to intercourse. Complainant's testimony regarding a holster and bullet, even if true, do not necessarily support the conclusion that defendant relied upon any threat to use a gun in order to force complainant to have sex with him. When asked why she did not flee, complainant said, "[b]ecause I just thought that I just could see myself running away, but if he caught me, he could run faster than me, he probably would be mad." The only testimony given by complainant regarding force prior to the alleged assault was her statement to the defendant, when the defendant began to pull her pants down, that "[y]ou aren't going to hurt me, are you?" and his response "[n]ot unless you have sex with me."

The court in *Warren* correctly noted that:

> "It is well settled that if complainant had the use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will. If the circumstances show resistance to be futile or life endangering or if the complainant is overcome by superior strength or paralyzed by fear, useless or foolhardy acts of resistance are not required. [Citation.]" (113 Ill. App. 3d 1, 6.)

See also *In re C.K.M.* (1985), 135 Ill. App. 3d 145.

The facts of this case do not indicate resistance to have been futile or life-endangering. While in *Warren* the court considered the disparities in size of the complainant and defendant, which in that case were 5 feet 2 inches tall and 100 to 105 pounds for the complainant and 6 feet 3 inches and 185 pounds for the defendant (see also *People v. Walsh* (1980), 80 Ill. App. 3d 754; *People v. Sims* (1972), 5 Ill. App. 3d 727), here such a consideration would compel no different result. In the instant case, complainant was 5 feet 5 inches tall and 105 pounds while the defendant testified to being 5 feet 6 inches and 150 pounds.

■■ ■ The complainant here admitted to scant or no resistance

when the defendant pulled down her pants and also when she was "indirectly" pushed into the backseat. Complainant removed her own underwear while defendant was outside of the car. She attempted no escape, nor did she cry for help, although by her own statements, there was either another person in view or within a few blocks' distance. She allowed a towel to be placed beneath her. Where a conviction for criminal sexual assault is based upon the testimony of the complainant, it must be clear and convincing or otherwise corroborated by other evidence. (*In re C.K.M.* (1985), 135 Ill. App. 3d 145; *People v. Barbour* (1982), 106 Ill. App. 3d 993.) While the existence of conflicting testimony alone is insufficient to cause a reversal of the trial court judgment in a sexual assault case (*People v. Schuning* (1984), 125 Ill. App. 3d 808, *rev'd on other grounds* (1985), 106 Ill. 2d 41; *People v. Grover* (1983), 116 Ill. App. 3d 116), however, the determination of the credibility of the witnesses will still be left to the trier of fact (*People v. Sanchez* (1982), 110 Ill. App. 3d 893; *People v. Lucien* (1982), 109 Ill. App. 3d 412). A reviewing court will set aside a jury's verdict of guilty only if the evidence is so palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory as to cause a reasonable doubt as to the guilt of the accused. *People v. Brown* (1984), 122 Ill. App. 3d 452; *People v. Walsh* (1980), 80 Ill. App. 3d 754.

■ We conclude that the evidence regarding force was clearly unsatisfactory to the degree that it serves to create a reasonable doubt as to this defendant's guilt. Owing to our decision in this issue, we find it unnecessary to consider the issue of the constitutionality of the Illinois criminal sexual assault statute.

Accordingly, the decision of the circuit court of Kane County is reversed.

Reversed.

LINDBERG, P.J., and UNVERZAGT, J., concur.