THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ERIC CARLSON, Defendant-Appellant.

First District (2nd Division) No. 1—95—0633

Opinion filed March 12, 1996.

Neville, Pappas & Mahoney, of Chicago (J. Mark Lukanich and Matthew P. Walsh, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Deborah Menas, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

On March 13, 1994, the complainant in this rape case, M.O., a 30-year-old teacher, went to watch the South Side Irish Parade with her sisters Aileen and Fiona, and her cousin Noelle. Because it was cold and rainy, they left the parade and went to Ken's Guest House, a nearby tavern. M.O. consumed 1 soda and $1^1/_2$ beers. Around 3:30 p.m. they left Ken's and waited in line to go into Keegan's Pub.

Michael Callahan, who was married to a cousin of M.O., was working Keegan's door that day. He testified that prior to M.O.'s arrival, he noticed 25-year-old Eric Carlson (defendant), who was drinking pints of cider (an alcoholic beverage), and who had his shirt off, showing some patrons his tatoos. According to Callahan, defendant "was very hyper." Although defendant admitted he had tatoos on his biceps, legs, and calf, he denied taking his shirt off at the bar.

Fiona left the bar because she was not feeling well. After an hour or two at Keegan's, M.O. met defendant and they engaged in small talk while getting drinks at the bar. Some time after M.O. returned to her sister and cousin with the drinks, she noticed defendant standing about 12 feet away. After exchanging looks, he "nodded" his glass and she approached him. He told her he was a police officer; however, he neglected to tell her that he had just been suspended. After about 45 minutes to an hour of talking and joking, M.O. kissed defendant. At this point, M.O. had consumed two beers at Keegan's. She claimed that she was not affected by the alcohol and "was in a very good state of mind." After M.O. and defendant decided to go

next door to a bar called Cork and Carry, she went back to where her sister and cousin were standing and told them she was going next door and would return; Aileen and Noelle promised to wait for her.

When M.O. and defendant went outside, they noticed that Cork and Carry was closing, and that the line was too long to go back into Keegan's, so they began walking and talking. Defendant claimed they kissed and, "she rubbed my crotch" through his clothes. At some point, defendant suggested that he get his car so that they could go to another bar. Because it was still cold and rainy, she waited for him to pick her up in a bar called Bucko's.

Ten to twenty minutes later, he returned driving a 1994 black Chevy Camaro. When she got in the car, they kissed. Then, defendant drove the car around the corner and put it in park. M.O. testified that the lighting conditions were "fully dark" and the street lights were on. "And then," according to M.O., "everything went crazy." She remembered the seat reclining and her "flying back in the seat." At trial, defendant claimed he did not recline the seat and did not know who caused it to do so. M.O. stated, "I remember him putting his hands in my pants." "I was begging him to stop. I was pleading. I was asking him, please, I don't want this." According to M.O., he made no verbal response, but just kept "pawing" her in places she did not want to be pawed.

Then, according to M.O., "the next thing I knew my pants were being pulled down. And he stuck his fingers in my vagina." M.O. claimed that at this point, defendant was positioned "over" her. She said, "He was over me," and "I mean, his whole body over on my side. But he was over me." On cross-examination, when asked whether she cooperated in taking off her pants, she testified that she did not cooperate, but instead, "laid there like a dead fish." When asked by defense counsel why she did not try to get out of the car, she stated, "I was frozen. I didn't know what to do. I was frozen. I couldn't move. I was terrified." M.O. testified that after he pulled her pants down, "I was begging him to stop. I kept saying please, no, this can't be happening to me. I don't want this to happen. I really don't." M.O. said that in response to her pleading, defendant told her she had a "beautiful pussy." Defendant, on the other hand, testified that she made no indication that she did not want him to perform oral sex, and that she, in fact, took her pants off.

When he finished performing oral sex, she thought it was over and that she could get up. However, when she opened her eyes to get up, she testified that she found that he was "bracing himself against the door [with his left hand]. And he was fiddling with his penis. Putting a condom on [with his right hand]." According to M.O., after she

saw this, "I just begged and I begged and I begged and I said no, no, no, this can't be happening. No, I don't want this to happen. This isn't what I want." Then, "[h]e rammed his penis in me. The pain was so bad. I never experienced pain like that before in my entire life. I just kept begging him, stop, please, this hurts."

When he finished having intercourse with her, she claimed she "curled up into a ball" and hugged her knees to her chest and cried. She said that defendant asked her if she was all right. In contrast, defendant alleged that after they were finished, she said, "I didn't know it would be this good." She remembered that she may or may not have told him that she wanted to go home, and the car started to move. She stayed where she was because, as she testified, her "body couldn't move"; and when she felt the car move she got up to get dressed, because she "knew that when he was driving he wouldn't come near [her] again."

When the car pulled up in front of Keegan's, she got out and, although she did not remember going through the door there, she remembered being inside. She did not recall saying anything to defendant when she got out of the car. According to Callahan, who was still working the door, he saw M.O. return to Keegan's between 7 and 8 p.m. He noticed that she looked different than she did earlier that day because her sweater was "wrinkled, [and] very ragged." She appeared untidy and her hair was tossed. Callahan testified that M.O. had been crying and her eyes were red, her make-up had run, and her cheeks were streaked. He asked her if she was "ok," but she appeared disoriented and walked past him straight for Aileen without giving any indication that she knew him.

Although M.O. did not remember having a conversation with her, Aileen testified that she was "rambling" and "not making sense"; that she looked disheveled, and seemed to be crying, and that her make-up was streaked. Aileen noted that M.O. had a "wild-eyed appearance," looked "vacantly," and was looking around like a "scared animal." M.O. went to the bathroom and saw Noelle, but she did not remember talking to her. Noelle testified that she "looked upset" as if she were "on the verge of tears." She asked M.O. if the "guy" had turned out to be a "jerk" and M.O. nodded her head and looked away as if she were going to start crying. She went into the bathroom ahead of Noelle, who was also waiting in line to use it. Once inside the bathroom, M.O. lost her balance. When she came out, Noelle noted that she was crying and "wild-eyed." According to Noelle, "she just sort of brushed past me as if I wasn't there." When M.O. returned to Aileen from the bathroom, she was rambling and unfocused. After Aileen grabbed her by the shoulder, she told Aileen, "he hurt me"

and "he raped me." When Noelle returned, Aileen told her that M.O. had been raped, and they decided to go to the hospital.

M.O.'s brother picked up M.O., Aileen, and Noelle from the bar and drove them to Christ Hospital. Aileen and Noelle testified that during the car ride, M.O. was "hysterical." According to Noelle, she was, "sobbing uncontrollably" and repeatedly said that she kept telling defendant "no."

They arrived at the hospital at about 8 p.m. At the hospital, M.O. saw a doctor and a nurse and was released. The parties stipulated that Dr. Barbara Schulfeld saw M.O. at 8:30 p.m. and would testify that she found a bruise on her vagina and no bruising or discoloration anywhere else. M.O. acknowledged that she did not have any other bruises, scrapes, or marks.

The next day, she identified defendant in a lineup.

On direct examination, and without objection, the prosecutor asked M.O., "Had you ever had sexual relations with a man?" and she answered, "No." During closing argument, defense counsel stated, "maybe it was her first time; maybe it wasn't. I don't know." The State made extensive use of this testimony in its closing arguments, relevant excerpts of which are as follows:

> "There's no expected behavior of a woman who I remind the court has managed to remain chaste for 29 years, and all of a sudden she's suddenly faced with forcibly having it taken from her in the front seat of a Camaro while she's on her period."
>
> "[T]hose are the ideal circumstances of how I'm going to lose my virginity in a front seat of a Camaro while on menstruation."
>
> "This woman managed to stay chaste for 29 years, and she had it take [sic] from her forcibly with a guy she thought she was safe with."

The circuit court, in a bench trial, found defendant guilty of three counts of sexual assault, and he was sentenced to three four-year sentences, to be served consecutively. The judge stated that this was a case of credibility and that "[p]lain [sic] and simply I believe the testimony of the victim and the State's witnesses," and that M.O.'s sister and cousin were able to verify "her terrible condition after the incident." Furthermore, he stated, "I believe the victim was paralyzed with fear and shock."

Whether the evidence is sufficient to sustain a conviction on review is determined by whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979). The same standard of review applies to sex crime

convictions as well. *People v. Collins*, 106 Ill. 2d 237, 478 N.E.2d 267 (1985), *cert. denied*, 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267 (1985); *People v. Schott*, 145 Ill. 2d 188, 203, 582 N.E.2d 690 (1991).

■ There is no dispute that defendant and M.O. engaged in sexual relations. The issue is one of consent. Defendant contends, however, that the State did not prove beyond a reasonable doubt that he committed criminal sexual assault. 720 ILCS 5/12—13 (West 1992). A person commits criminal sexual assault where s/he "commits an act of sexual penetration by the use of force or threat of force." 720 ILCS 5/12—13(a)(1) (West 1992). "Consent" is a defense to criminal sexual assault. 720 ILCS 5/12—17(a) (West 1992). "Consent" is defined as:

> "a freely given agreement to the act of sexual penetration or sexual conduct in question. Lack of verbal or physical resistance or submission by the victim resulting from the use of force or threat of force by the accused shall not constitute consent." 720 ILCS 5/12—17(a) (West 1992).

Defendant argues that there was no force involved. On the contrary, the trier of fact properly found the presence of force based on M.O.'s testimony, which he found credible, that she was caused involuntarily to go "flying back in the seat"; that "his whole body" was "over" her; that she received a bruise from acts which caused the kind of pain she had never before experienced; and that he continued to engage in sexual acts despite her continual verbal protests.

■ Defendant correctly points out that where, as here, a sexual assault victim has the use of her faculties and physical powers, the evidence must show resistance that will demonstrate that the act was against her will, citing *People v. Warren*, 113 Ill. App. 3d 1, 6, 446 N.E.2d 591 (1983). Defendant also acknowledges that, under *Warren*, if the State proves that "*the complainant* is overcome by superior strength or *paralyzed by fear, useless* or foolhardy *acts of resistance are not required.*" (Emphasis added.) *Warren*, 113 Ill. App. 3d at 6; *People v. Bowen*, 241 Ill. App. 3d 608, 620, 609 N.E.2d 346 (1993), *appeal denied*, 151 Ill. 2d 568, 616 N.E.2d 339 (1993), *cert. denied*, 510 U.S. 946, 126 L. Ed. 2d 336, 114 S. Ct. 387 (1993) ("Merely because a victim does not cry out for help or try to escape at the slightest opportunity is not determinative on the issues of whether she was being forced *** especially if she was *** paralyzed by fear").

In *Warren*, the appellate court reversed a finding of sexual assault where the essential facts were undisputed, because the alleged victim never told the defendant to leave her alone and did not object when defendant instructed her to take off her pants. *Warren*, 113 Ill. App. 3d at 5. In fact, the *Warren* court found that the alleged victim failed to "communicate in some objective manner" a lack of consent.

*Warren*, 113 Ill. App. 3d at 6. The instant case is clearly distinguishable in that here, what happened during the sexual encounter is hotly disputed. M.O. communicated in an objective manner that she was not consenting. As evidenced by the record, she testified that she begged him over and over from the very beginning of his sexual advancements to stop and pleaded with him that she "didn't want this to happen," repeatedly saying, "no, no, no."

At oral argument in this court, defendant maintained that it was "irrational" for M.O. to be "paralyzed by fear" in light of the type of force alleged and asserts consent as a defense, as he does throughout his briefs, thus conceding that his arguments really go to credibility and challenge the fact finder's conclusions.

Yet it is black letter law that the credibility of witnesses is determined by the trier of fact, in this case, the trial judge, who expressly found M.O.'s testimony credible. *People v. Velez*, 123 Ill. App. 3d 210, 462 N.E.2d 746 (1984). It is well settled that a criminal sexual assault conviction may be sustained on the victim's testimony alone. *People v. Schott*, 145 Ill. 2d 188, 582 N.E.2d 690 (1991).

In response to defendant's allegation that it failed to "even remotely suggest" that M.O. was "paralyzed by fear," the State correctly points out that she testified she was uncooperative, lying "there like a dead fish"; and more important, when defense counsel asked her if she ever tried to escape, she replied, "I was frozen. I didn't know what to do. I was frozen. I couldn't move. I was terrified." She further testified that afterwards, her "body couldn't move." Surely, this testimony, which the judge believed to be true, is evidence that M.O. was "paralyzed by fear" under *Warren*. 113 Ill. App. 3d at 6. Indeed, the judge stated, "I believe the victim was paralyzed with fear and shock." This is obviously distinguishable from *People v. De-Frates*, 33 Ill. 2d 190, 195, 210 N.E.2d 467 (1965), cited by defendant, in which the court found that there was nothing in the record to support a conclusion that the victim was paralyzed by fear.

■ Finally, defendant contends that his case is similar to *People v. Walker*, 154 Ill. App. 3d 616, 506 N.E.2d 1004 (1987), in which the court reversed a conviction of aggravated criminal sexual assault (now 720 ILCS 5/12—14 (West 1992)). For several reasons, we find the instant case to be clearly distinguishable. *Walker* involved a conviction of aggravated criminal sexual assault, a different crime. Here, the trial court refused to find aggravated criminal sexual assault, stating:

> "However, as to Counts 1, 2, and 3 which indicates [*sic*] a bruised vaginal area making it aggravated criminal sexual assault, I do not believe that the legislature had that in mind."

More important, in *Walker*, the court applied a much different standard of review than that which we are required to employ today. See *Schott*, 145 Ill. 2d 188, 582 N.E.2d 690. The sex offense involved in *Walker* took place in 1985, when courts of review were obliged to reverse a conviction of a sex offense if the victim's testimony was not "clear and convincing or substantially corroborated." See *People v. Coates*, 109 Ill. 2d 431, 440, 488 N.E.2d 247 (1985); *People v. Morgan*, 69 Ill. 2d 200, 206, 370 N.E.2d 1063 (1977). Today, reviewing courts must adhere to the standard set forth in *Collins*, 106 Ill. 2d 237, 478 N.E.2d 267. *Schott*, 145 Ill. 2d at 202-03.[1]

It must also be noted that not only is the standard of review different and that there are differences in the crimes, but there are also differences in the evidence adduced in the two cases. In *Walker*, there was no evidence that the alleged victim begged and pleaded with defendant to stop, said "no" repeatedly, and was "frozen" or "paralyzed with fear" or "terrified," as in the case *sub judice*. Furthermore, in contrast with this case, the appellate court in *Walker* pointed out that there was a "serious question raised regarding the complainant's credibility," for not only did her testimony differ from that of defendant, but it also differed as to the testimony of other witnesses. *Walker*, 154 Ill. App. 3d at 623-24. Despite the fact that defendant's testimony here differed from that of M.O., there is nothing in the record which could cause this court to question the circuit court's determination of credibility.

Moreover, there were witnesses in abundance who testified to M.O.'s condition immediately following the rape. Aileen, Noelle, and Callahan related that she was very upset, seemed to have been crying, was disheveled, and unfocused. Aileen and Noelle testified that M.O. was "hysterical" on the way to the hospital. Although no corroboration is necessary (*Schott*, 145 Ill. 2d 188, 582 N.E.2d 690), such evidence substantiates her testimony that she did not consent to having sexual relations with defendant. *People v. Kemblowski*, 227 Ill. App. 3d 758, 762, 592 N.E.2d 282 (1992). The rape is further corroborated, although no longer required, by M.O.'s prompt complaint. *People v. Graham*, 60 Ill. App. 3d 1034, 1045, 377 N.E.2d 179 (1978); *People v. Henley*, 36 Ill. App. 3d 223, 226, 343 N.E.2d 656 (1976); *Schott*, 145 Ill. 2d 188, 582 N.E.2d 690.

---

[1]"The rule *** that the evidence in a sex offense case must be substantially corroborated or the testimony of the victim must be clear and convincing—is entirely arbitrary and a reflection of the archaic and sexist views held by nineteenth-century legal practitioners." *People v. Cole*, 193 Ill. App. 3d 990, 998-99, 550 N.E.2d 723 (1990) (Steigmann, J., specially concurring).

Accordingly, after a review of all the evidence in the light most favorable to the prosecution, we cannot say that M.O.'s reaction to defendant's advances amounted, in the words of the statute, to "a freely given agreement to the act of sexual penetration or sexual conduct in question." 105 ILCS 5/12—17(a) (West 1992). Especially in this case, where defendant's entire body was "over" the victim and she protested his conduct in clear and unequivocal terms, despite her being "paralyzed with fear and shock," it should have been unmistakably manifest to defendant that M.O. not only had the indefeasible right to say "no," but that when she said it, "no" meant "no"; and the intimacies he may have shared with her prior thereto did not grant him the liberty to extract from her that which was hers and only hers to "freely" yield.

■ It is undisputed that the Illinois rape shield statute provides, with certain exceptions not applicable here, that evidence of "prior sexual activity" of the victim is inadmissible. 725 ILCS 5/115—7(a) (West 1992). Our supreme court has held that neither the defendant nor the State may introduce evidence of a victim's past sexual history. *People v. Sandoval*, 135 Ill. 2d 159, 170-71, 582 N.E.2d 726 (1990), *cert. denied*, 498 U.S. 938, 112 L. Ed. 2d 307, 111 S. Ct. 343 (1990). In the instant case, the State admits that in clear violation of the rape shield statute, it introduced evidence and argued in its closing statements that M.O. was a virgin before she was attacked. However, defendant waived his right to raise the issue because he failed to object to the testimony and the closing arguments at trial. *People v. Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124 (1988), *cert. denied*, 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274 (1988) (a party waives an issue for review where it fails to object at trial).

However, to ameliorate the severity of the waiver rule, Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) permits this court to consider "an error which deprived the defendant of a fair and impartial trial or any substantial error which occurs in cases where the evidence is closely balanced." *People v. Gonzalez*, 238 Ill. App. 3d 303, 314, 606 N.E.2d 304 (1992), citing *People v. Schmidt*, 168 Ill. App. 3d 873, 522 N.E.2d 1317 (1988), *appeal denied*, 122 Ill. 2d 589, 530 N.E.2d 259 (1988).

Defendant cites *People v. Kemblowski*, 201 Ill. App. 3d 824, 559 N.E.2d 247 (1990), and *People v. Sales*, 151 Ill. App. 3d 226, 502 N.E.2d 1221 (1986), to support his position that the introduction of evidence that the victim was a virgin constitutes reversible error. In *Kemblowski*, the State introduced evidence that the victim was a lesbian and that, although she was married, it was to a homosexual and they never "sexually consummated" their marriage. *Kemblowski*, 201 Ill.

App. 3d at 826-27. This court reversed and remanded the case for a new trial, finding that the trial judge's admission of testimony, over the defendant's objection, that the victim was a lesbian was not only erroneous but also prejudicial and denied the defendant his right to a fair trial because her "avowed preference for sexual activities with women necessarily affected the jury's assessment" of whether she consented. *Kemblowski*, 201 Ill. App. 3d at 829. The instant case, of course, is distinguishable from *Kemblowski* in that evidence that a victim is a lesbian is much more prejudicial, because it implies that she would not consent to have sex with any man at any time.

In *Sales*, the trial court reversed and remanded the cause for a new trial because there was a reasonable basis to believe that the jury was prejudiced and that defendants were denied a fair trial based on the fact that the prosecutor improperly used race, the homosexuality of one of the defendants, and the victim's past sexual history (*Sales*, 151 Ill. App. 3d at 233), a far different set of circumstances than we are presented with in the case at bar.

Just as important is the fact that *Sales* and *Kemblowski* were jury trials, where the risk of prejudice is far greater. As noted in *People v. Richardson*, 123 Ill. 2d 322, 361, 528 N.E.2d 612 (1988), *cert. denied*, 489 U.S. 1100, 103 L. Ed. 2d 943, 109 S. Ct. 1577 (1989), and *People v. Crum*, 183 Ill. App. 3d 473, 539 N.E.2d 196 (1989), *appeal denied*, 127 Ill. 2d 624, 545 N.E.2d 118 (1989), absent any contrary indication in the record, a trial court is presumed to recognize and disregard incompetent and improper matters presented to it. Although defendant claims that the evidence relating to M.O.'s past sexual history "obviously impacted the trial court's assessment" of defendant's and her credibility, he points to nothing in the record to support this accusation. In fact, the record demonstrates otherwise, for in explaining his reasons for finding defendant guilty, the trial judge does not even mention M.O.'s past sexual history. Instead, he states that the case was one of credibility and that he found M.O. and her supporting witnesses to be credible.

Finally, the evidence in this case is not so closely balanced that defendant was deprived of the right of a fair trial. The evidence of defendant's assault is not based merely on his word against M.O.'s. Her testimony is corroborated by Aileen's, Noelle's, Callahan's, and by her making an immediate complaint. Therefore, because we find that this is not a closely balanced case, and because a judge is presumed to disregard improperly introduced evidence, we conclude that defendant was not deprived of a fair trial merely because evidence of M.O.'s past sexual history was introduced.

Consequently, for all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

HARTMAN, P.J., and DIVITO, J., concur.