NO. 4-05-0516    Filed 4/19/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Douglas County |
| KELLY J. DENBO, | ) | No. 04CF99 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Frank W. Lincoln, |
| | ) | Judge Presiding. |

JUSTICE APPLETON delivered the opinion of the court:

A jury found defendant, Kelly J. Denbo, guilty of aggravated criminal sexual assault (720 ILCS 5/12-14(a)(2) (West 2004)) in that she persisted in an act of vaginal penetration after the victim withdrew her consent. The trial court sentenced defendant to imprisonment for seven years. She appeals on the ground of insufficiency of the evidence, arguing that the State failed to prove the victim's withdrawal of consent or her own use of force.

Defendant put her hand into R.H.'s vagina during otherwise consensual sexual relations. R.H. pushed defendant twice--harder the second time--intending to signify that she no longer consented to the sexual penetration. Defendant removed her hand from R.H.'s vagina on the second push. Looking at the evidence in a light most favorable to the prosecution, we conclude that no rational trier of fact could find, beyond a reason-

able doubt, that the first push objectively communicated to defendant a withdrawal of consent. The State failed to prove the element of force. Therefore we reverse the trial court's judgment.

## I. BACKGROUND

The information charged that on September 27, 2004, defendant committed aggravated criminal sexual assault (720 ILCS 5/12-14(a)(2) (West 2004)) "in that[,] by the use of force[,] [s]he placed her fist into the vagina of [R.H.] and, in doing so, *** caused bodily harm, vaginal trauma, to *** [R.H.]."

At trial on April 20, 2005, the State called R.H., the adult complainant, as its first witness. Because she was extremely hard of hearing, practically deaf, she testified through an interpreter. R.H. first met defendant in June 2004 at a nursing home, where they both worked. They developed a romantic relationship. On September 27, 2004, they both had the day off and spent it together, taking defendant's one-year-old nephew and three-year-old niece to McDonald's, Rockome Gardens, and a video store. Afterward, R.H. stayed for a cookout at defendant's house in Tuscola. Defendant drank beer while grilling the steaks, but R.H. abstained from alcohol that evening. After supper, R.H. went to defendant's bedroom "and just kept waiting and waiting and waiting" while defendant talked on the telephone. "[O]kay," R.H. thought. "[She] waited a little longer[] and *** thought

[that defendant] was going to give the kids a bath." Eventually, she told defendant she was "go[ing] to the store [to] get a diet [C]oke and would be right back." Defendant appeared to be "out of it": "she was very slow to respond and *** slurred her words." Upon returning from the store, R.H. noticed the lights were off in the bedroom--they were on when she left--and three candles were burning. She did not see defendant. R.H. lay down, clothed, on defendant's bed. Defendant entered the bedroom. "She had a robe on," R.H. testified, "and like a ballet outfit or something. I really don't know. I was kind of hum."

Here is what happened next, according to R.H.:

"Well, I was [lying] on the bed[,] and she was on me--kind of straddled me[--]and kissing my face[,] and then she pulled me forward. She grabbed both my arms[,] and then she took off my top and my bra[,] and all of that was within--say[,] a short period of time. Then she shoved me, and she was rough. I thought, [H]um. I had no clue as to what was going on, and then she took my shorts off and my underwear off.

Q. What happened next?

A. Well, then she went right through my vagina. I didn't scream. I didn't do any-

- 3 -

thing.  I knew the kids were asleep.  Knew the kids were asleep[,] and she kept pushing me.

Q. What did you do to her?

A. And it continued[,] and then the second time I tried to push her away[,] and it was hard enough.  I was able to get up.  I went to the bathroom[,] and I was bleeding.

Q. Let's back up a little bit.  You indicated you were [lying] on the bed.  How was Kelly on you?

A. Kelly was kneeling on top of me and had my legs spread apart so she was in between my legs.

Q. You said she 'went through' you.  Explain what was used to go through you?

A. Right there, her hand.  (Indicating)

Q. Where did she place her hand?

A. Went through the pelvic area.  I tried to push her back, but she continued[,] and she just kept continuing, and then I pushed her again, and then I went to the bathroom, and I was bleeding.  I came back out and was looking for her[,] and she was

outside at that point and crying.

Q. You went to the bathroom and noticed you were bleeding?

A. Yes.

Q. Where was the bleeding from?

A. Well, the reason I was bleeding is because she hurt me.  She used her hand to go direct[ly] through my vagina, yes, my vagina.

Q. When was the next time you saw the [d]efendant?

A. Well, I went to the bathroom--I went into the bathroom[,] and I came back out and was talking to her[,] and I asked her at that point why she did it.  She said she didn't know why she hurt me.  I continued to ask her.  I stayed at Kelly's because I needed an answer from her as to why she hurt me."

Because R.H. was deaf, she and defendant often communicated with one another in writing.  R.H. offered--and the trial court admitted into evidence, over defendant's foundational objection--eight handwritten letters R.H. had received from defendant.  According to R.H., defendant wrote People's exhibit No. 1 on September 27, 2004, shortly after the incident.  It says:  "I will let you know tomorrow night.  Is [illegible] us.

- 5 -

Okay[?]  I love you.  I'm taking a shower."

R.H. testified she received People's exhibit No. 2 on September 28, 2004.  That letter reads as follows:

"I know that no amount of apologies [is] going to be okay.  I am sorry that that happened.  Okay[?]  I can't believe that I could do what someone did to me.  It makes me fucking sick to my stomach[,] and I am sorry. I am worried.  I do want you to be okay.  I should have said something sooner.  I've done wrong[,] and it will never be forgiven or forgotten.  I am truly sorry[,] though.  Be careful.  I don't want to lose you.  That's not what I want.  I scared you, yes.  I can apologize forever for that.  There [is] no amount of apologies I can give you.  Yes, you are to[o] good for me.  I love you[,] and I hurt you.  This is something that can't be forgiven.  I'm so sorry.  I never meant for this to happen.  We probably need some time apart for awhile.  I need to straighten out my scary side.  Med[ication]s or something. I don't want to break up.  Maybe I need to get rid of [the] scary side of me.  I know I

- 6 -

have one.  We need time apart--okay[?]  I'm
sorry it had to end this way.  I will not
quit [because] I love my residents.  I am
sorry I hurt you last night.  I don't want to
hurt anyone else that way again[,] [includ-
ing] you.  I'm sorry.  I swear to you that I
did not hear you say no.  I am not the kind
of person that does this.  I care that I hurt
you.  I'm sorry you're shocked.  I'm sorry I
did this.  I'm just sorry.  Okay[?]  I knew
you can't take me back.  That's understand-
able.  There [is] no amount of sorrys I can
give you.  I'm sorry.  Please let me know if
you're going to send me to jail or tell work.
Okay[?]  So I can quit and go elsewhere.  I
am sorry about what happened."  (Emphasis in
original.)

R.H. testified that defendant sent her the remaining
letters in October 2004 through an intermediary at work.  Peo-
ple's exhibit No. 3 reads as follows:

"I do love you and care for you.  I'm
very worried about you.  I know you said not
to.  I'll do it anyway.  My feelings about
what I've done are mixed.  I should die for

what I've done.  I feel like I should not be with you because of this.  I want to be with you.  But after what I've done[,] I feel horrible, sick.  I don't feel like I deserve you.  We need time[,] okay[?]  I'm going to have to feel right about myself before I can go on with you[,] okay[?]  Please understand.  I do want you[,] okay[?]  I just need time to fix myself."

People's exhibit No. 4 appears to consist of three letters.  Here is the first one:

"I did read your note.  I do get mean sometimes, when I'm drinking.  Not always[,] though.  And I'm sorry that I hurt you when I do.  I do realize that I've done it[,] and I'm sorry.  It makes me feel like shit when I do[,] and no amount of apologizing can make up for it.  I only hope I can change and give you the life and love you want[,] because I want it with you.  I love you.  Very much.  I'll try to show it better.  I'm learning[.] I'm thinking that I love you and I don't want to hurt you anymore.  I do have a temper.  It comes out quick[ly].  I'll learn to deal with

it[,] okay[?]  I love you.  I don't want to
lose you[,] okay[?]  Right now I'm by myself
on [the] west hall[,] and it's a lot of work
right now.  I'm sorry I'm late writing you.
I'll do my hardest to please you forever.
You are my only true love.  I will always
love you.  Let me know if you are coming over
tonight."

The second letter in People's exhibit No. 4 reads as follows:

"I know it seems like I don't care.  But
I do.  It just so happens that I am under a
great deal of stress.  The kids, my parents,
brother.  My job.  I have blood in my bowels
because I am under too much stress.  Then I
broke a blood vessel in my eye.  It[']s been
a very stressful week.  Also I hurt you.
That[']s just making it all the more stress-
ful.  I do care.  But I'm at my stress point
right now.  I do love you.  But I asked [for]
time away to sort out my life.  I need to
unstress myself.  I[']m getting to the point
of saying fuck it to life and go[ing] away.
But I know I can't.  I just need time[,]
okay[?]  Not forever.  I'm sorry I haven't

been nice.  I'm just stressed out.  A lot of
crap is piling on me[,] and I'm sorry for
taking it out on you.  [The] [r]eason I
touched you like that down [there] is I
thought you would be okay with that kind of
lovemaking.  I was way to[o] rough.  I[']m
never like that[,] okay[?]  I should have
asked you about it.  I was to[o] rough when I
should have been gentle with you[,] and I
take full responsibility for what I've done.
Now all you can do is give me time and space.
I love you[,] okay[?]"

In the third letter in People's exhibit No. 4, defendant said:

"I am so sorry I hurt you that way.  I
can't believe I was capable of doing that to
anyone.  What exactly do they have to do to
fix you[?]  I am responsible for this.  I
feel the need to be killed in some horrible
way right now.  I feel that I don't need to
be forgiven, ever.  I am very sorry this
happened.  We do need time because I need to
fix my temper, drinking.  Basically, myself.
I am truly sorry that I did this.  I love you
and did not want to hurt you.  Please believe

- 10 -

me when I say it wasn't intentional.  I am
sorry.  I know we need to talk.  We will.  I
need time to sort out what you just told me.
I am sorry."

People's exhibit No. 5 says:  "I really do hope
you[']r[e] not upset with me.  I want you on Sunday and Monday.
Is that okay[?]  I won't go if you[']r[e] going to be upset.  I
love you and wanna a few days with you.  But I promised my
cousins.  Don't be angry."

The final letter, People's exhibit No. 6, says:  "First
of all[,] I know in my heart I did not rape you.  I did[,]
however[,] make you bleed[,] and for that I'm sorry."

The prosecutor asked R.H. the following:

"Q. Was this touching without your con-
sent?

* * *

A. No, no[,] I did not consent to that.
I did not consent to that."

On cross-examination, defense counsel asked R.H.:

"Q. You said earlier, I think, that
Kelly was kneeling on the bed[,] on top of
you?

A. I had my legs spread apart[,] and she
was in between them, between my legs.

- 11 -

Q. You said she removed your top and your bra?

A. Yes.

Q. Did you try to stop her from doing that?

A. No.

Q. And you said she removed your pants and underwear?

A. Yes, yes[,] that is correct.

Q. Did you try to stop her from doing that?

A. No.

Q. I think you said[,] in your direct testimony[,] that then Kelly [']went[']--and your words were[] [']right through my vagina[']?

A. That is correct.

Q. Could you explain what you mean by that[,] exactly?

A. Well, the hand itself went right through my privates.  I tried to push her back, but she continued[,] and then I pushed her again[,] and then I was able to get up and go to the bathroom[,] and that is when I

noticed I was bleeding."

R.H. admitted spending the rest of the night with defendant in her bed. She admitted having sex with defendant on three occasions before the incident. These sexual encounters were all in defendant's bedroom. After September 27, 2004, R.H. visited defendant's house one time. It was defendant's idea that she come over, but when she saw that defendant had been drinking, she went home.

On redirect examination, the prosecutor asked R.H. why she did not immediately leave the premises after defendant pushed her hand through her vagina. R.H. answered: "Because I wanted to know why she had hurt me[,] and I had no clue. I never *** could understand why." The trial adjourned for the day.

On April 21, 2005, the State called a Tuscola police officer, Richard A. Lamb, as its next witness. He testified he interviewed R.H. on November 9, 2004. The interview was origi- nally scheduled to occur two weeks earlier, but he had to cancel that appointment because of difficulty finding an interpreter. "[D]ue to the time frame," the letters (People's exhibit Nos. 1 through 6) were the only physical evidence the police collected in the case.

The State then called Marlene Kremer, a family practice physician from Sarah Bush Lincoln Health Center in Mattoon. She testified that on September 30, 2004, she received a message at

her office requesting that she telephone R.H.'s roommate, Donna Goad. "The message said that [R.H.] had been raped and was very upset and she needed an appointment." Kremer returned the telephone call and scheduled an appointment for that same day. R.H. arrived at the office with Goad, looking "very anxious and upset." The prosecutor asked Kremer:

"Q. How did she describe that she had been injured?

A. She said that three days before, her long[]time girlfriend had--was intoxicated[] and had forced her to have--using some type of an object, which I do not know what the object was, had repeatedly thrust this object into her vagina. Then she was able to fight her off and left."

The wall of R.H.'s vagina "was very abraded. It was kind of like a rug burn. There were no obvious lacerations. There was no bleeding at the time of this exam, but it was just very abraded, irritated"--as if the vagina had suffered from "[e]xcessive friction." Kremer would have expected R.H.'s vagina to look like this if R.H.'s girlfriend had done what R.H. said. It was possible that the vagina bled at the time of the injury.

The prosecutor asked Kremer whether posttraumatic stress syndrome was "accepted as a behavioral condition that

- 14 -

[could] result from sexual assault" and whether she had "dealt with" this condition in the course of her profession.  To both questions, Kremer answered yes.  The prosecutor asked her to describe the "model characteristics" of the syndrome.  Kremer answered:

> "It's a person who has either witnessed
> or been a victim of a severely traumatic
> event, where they felt very hopeless,
> helpless--had no control and[,] subsequent to
> that[,] *** they have either [sic] flashback
> recollections.  They avoid situations or
> things that make them recall that event.
> They have changes in their behavior, either
> [sic] difficulty sleeping, you know, more
> irritable, those type[s] of behaviors."

Kremer continued treating R.H. after September 30, 2004--who, in fact, was her patient before then.  Kremer saw her again on October 22, 2004.  At that time, she diagnosed posttraumatic stress disorder.  R.H. was "having crying spells. She was still able to go to work[] but was otherwise not doing much of anything else."  She saw R.H. again on November 12, 2004, and found her to be still suffering from the disorder.  She saw no symptoms of the disorder before September 30, 2004.

The State rested, and defendant moved for a directed

verdict on the ground that the State had failed to prove "the use of force or threat of force." See 720 ILCS 5/12-14(a), 12-13(a)(1) (West 2004). Defense counsel argued: "All of the evidence points to the fact that this was a voluntary interaction. It occurred in Ms. Denbo's home, in her bedroom, on her bed, where the alleged victim came in and la[y] down and voluntarily *** allowed Ms. Denbo to undress her *** and then engaged in a sexual act that she didn't object to." The prosecutor responded that because R.H. objectively showed her lack of consent by pushing defendant and defendant nevertheless continued to ram her hand into R.H.'s vagina, the State had proved the element of force. The trial court denied the motion for a directed verdict.

Defendant called her mother, Nancy Denbo, as her first witness. Denbo testified she lived in a small two-bedroom house on Overton Street in Tuscola. In the summer of 2004, R.H. began visiting defendant at Denbo's house two or three times a week. On September 27, 2004, Denbo worked from 2 to 10 p.m. at the nursing home. After coming home between 10:30 and 10:45 p.m., she took a shower and watched television with her husband, her son, her grandchildren, defendant, and R.H. Nothing unusual happened that evening after she got home; she was aware of no disturbance. Because "the kids" (apparently, defendant's nephew and niece) typically "g[o]t up pretty early," Denbo probably rose

between 7 and 7:30 a.m. on September 28, 2004.  R.H. was still in the house, and nothing seemed amiss.  After breakfast, Denbo and R.H. "drank coffee out in the carport" for a couple of hours while the children played outside.  R.H. left between 11 and 11:30 a.m. because Denbo had to go in and start getting ready for work.  After September 27, 2004, R.H. came over twice for dinner and even stayed overnight sometime in October 2004.

Defendant called Goad as her next witness.  She testified she lived in Atwood with her son and R.H.  For the past four years, Goad had been a dietary supervisor at the nursing home.  She was R.H.'s boss.  Goad was only casually acquainted with defendant; she knew that defendant worked at the nursing home and had a relationship with R.H.  The evening of September 28, 2004, Goad saw R.H. at home and noticed nothing unusual about her behavior at that time.  On September 29, 2004, R.H. came to work an hour early to speak with Goad.  R.H. did not finish her shift that day; "she *** said that she was bleeding."  She also missed work on September 30, 2004, because "she was still having problems and she wasn't going to be able to work."  Goad explained to her the nursing home's policy:  "if you miss two days because of illness, *** you have to go to the doctor."  Therefore, on September 30, 2004, Goad accompanied R.H. to the doctor's office.  A week or two later, at R.H.'s request, Goad set up an appointment for her with a counselor.

- 17 -

The defense next called Mary Burton, who testified that she lived in Tuscola, across the street from defendant.  She had seen R.H. visiting at defendant's residence during the summer of 2004, when they were dating.  R.H. was there "[u]p to four or five times a week, given their schedule at work."  R.H. typically arrived in her white "mini-truck."

Defendant then took the stand.  She testified that she lived with her mother, brother, nephew, and niece in Tuscola.  She met R.H. around the end of May 2004, and by the end of June 2004, they were lovers.  From June until October 2004, R.H. visited defendant's house three or four times a week and usually stayed overnight.  On September 27, 2004, R.H. came over for a cookout.  Defendant had two beers that evening but did not become intoxicated.  After dinner, she and defendant watched a couple of movies with the children.  Defendant then bathed and dressed the children and handed them over to her brother's care so that she could be alone with R.H.  Defendant took a shower around 9 or 9:30 p.m., and while R.H. was at the store, she set the scene in the bedroom:  lit the candles, put on some music, and turned off the lights.  Upon returning, R.H. lay on the bed.  Defendant entered the bedroom, wearing a robe and a silky negligee--"a white[,] strange teddy thing."  She lay down next to R.H. and talked with her for a few minutes.  (R.H. could understand her if she raised her voice.)  Then they "started getting intimate,"

- 18 -

"kissing and touching."  Defendant helped R.H. remove her top and bra and then her shorts and boxer underwear.

Defendant testified:

"We were having--I was giving her oral sex[,] and I was[,] I guess[,] down in that area, and I began to digitally[,] with two fingers, insert them into her vagina[,] and we had sex relations that way.

Q. Okay.  Now[,] at that point[,] what did [R.H.] do, if anything?

A. Well, I guess she was enjoying it. She didn't tell me to stop.  She didn't push me away.

Q. During this time, up to this point, had she said anything to you?

A. Not that I can recall.

Q. What happened next[,] then?

A. I guess she was done, and my head was still in that particular area, so she nudged my shoulder.  And I didn't hear her the first time, because music was on and my head was in an uncompromising [sic] position.

Q. Okay.

A. But she nudged my shoulder[,] and I

looked up[,] and she said she was finished[,] and I said okay, and at that time she went to the bathroom.

Q. Okay.

A. She came back and said she was bleeding a little.  She said she was hurting[,] and I apologized.  I didn't know that I might have hurt her a little bit digitally, doing that to her.

Q. How did she appear to you then?

A. She was a little scared about the bleeding.  She was bleeding a little bit.  I do admit that.  But she was okay.  We talked, and then we wound up going to bed not too long after[ward].

Q. Did she, during the time you were having sexual relations together, did she ever scream or cry out, or anything?

A. No, not that I can recall.

Q. And did she stay there the night with you?

A. Yes.

Q. And slept there with you in your bed?

A. Yes."

R.H. was still in bed with defendant the next morning when the children leaped onto the bed and awaked them.  After defendant made breakfast for the children and got them dressed, she and R.H. went outside with defendant's mother and drank coffee.

According to defendant, R.H. spent the night at defendant's house on two occasions after September 27, 2004.  Her relationship with R.H. deteriorated, and defendant broke it off about the second week in October 2004.  Defendant disagreed that all of the letters in People's exhibit Nos. 1 through 6 pertained to the incident of September 27, 2004.  According to her, some of the letters predated the incident.  She claimed to have written People's exhibit Nos. 1, 2, and 5 during the summer of 2004 (before September).  She claimed to have written People's exhibit No. 3 at work around September 30, 2004, and People's exhibit Nos. 4 and 6 right after September 27, 2004.  Defendant denied forcibly having sex with R.H.

On cross-examination, defendant testified that when she gave oral sex to R.H. in the bedroom on September 27, 2004, R.H. had an orgasm.  Defendant denied using force when digitally penetrating her, although she remarked that "fingernails [could] scrape."  Defendant rested.

In its case in rebuttal, the prosecutor presented People's exhibit No. 7, a record of defendant's conviction in Georgia for deposit account fraud.  The State also recalled R.H.,

who denied that defendant performed oral sex on her the night of September 27, 2004, and denied having an orgasm when defendant digitally penetrated her that night. According to R.H., she visited defendant's house once after September 27, 2004: on October 1 or 2, 2004. Defendant telephoned her, and R.H. came over and stayed with the children for about 10 minutes, until she perceived that defendant had been drinking, whereupon she left. R.H. denied spending the night at defendant's house anytime after September 27, 2004. The State rested, and the jury found defendant guilty of aggravated criminal sexual assault.

On May 25, 2005, the trial court sentenced defendant to 7 years' imprisonment, with credit for 66 days, followed by 3 years of mandatory supervised release.

This appeal followed.

## II. ANALYSIS

The State charged defendant with aggravated criminal sexual assault within the meaning of section 12-14(a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/12-14(a)(2) (West 2004)). That section provides as follows:

"(a) The accused commits aggravated criminal sexual assault if he or she commits criminal sexual assault and any of the following aggravating circumstances existed during *** the commission of the offense:

                    ***

                    (2) the accused caused bodily

              harm *** to the victim ***."  720

              ILCS 5/12-14(a)(2) (West 2004).

          Thus, to commit aggravated criminal sexual assault, one

must commit criminal sexual assault.  According to the informa-

tion, defendant committed criminal sexual assault within the

meaning of section 12-13(a)(1) of the Code (720 ILCS 5/12-

13(a)(1) (West 2004)).  That section provides as follows:

              "(a) The accused commits criminal sexual

              assault if he or she:

                    (1) commits an act of sexual

              penetration by the use of force or

              threat of force[.]"  720 ILCS 5/12-

              13(a)(1) (West 2004).

"Sexual penetration" includes "any intrusion, however slight, of

any part of the body of one person *** into the sex organ *** of

another person."  720 ILCS 5/12-12(f) (West 2004).  Section 12-

12(d) defines "force or threat of force" as follows:

              "(d) 'Force or threat of force' means

              the use of force or violence, or the threat

              of force or violence, including but not lim-

              ited to the following situations:

                    (1) when the accused threatens

                         - 23 -

to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believed that the accused had the ability to execute that threat; or

(2) when the accused has overcome the victim by use of superior strength or size, physical restraint[,] or physical confinement."  720 ILCS 5/12-12(d) (West 2004).

"Force," within the meaning of sections 12-12(d) and 12-13(a)(1) of the Code, does not mean the force inherent to all sexual penetration--for example, the exertion of the hand in the act of pushing into the vagina--but physical compulsion, or a threat of physical compulsion, that causes the victim to submit to the sexual penetration against his or her will.  People v. Haywood, 118 Ill. 2d 263, 274-75, 515 N.E.2d 45, 50-51 (1987); People v. Kinney, 294 Ill. App. 3d 903, 908, 691 N.E.2d 867, 870-71 (1998).

In its case in chief, the State has the burden of proving the element of force beyond a reasonable doubt.  Haywood, 118 Ill. 2d at 274, 515 N.E.2d at 50.  By proving force, the

State necessarily proves nonconsent, for "if *** one was forced to perform an act, it follows that [one's] act was nonconsensual; and if one freely consents to the performance of an act upon oneself, clearly [one] has not been forced." Haywood, 118 Ill. 2d at 274, 515 N.E.2d at 50; see also People v. Roberts, 182 Ill. App. 3d 313, 317, 537 N.E.2d 1080, 1083 (1989). The defendant may raise the defense of consent to rebut the State's evidence of force. Haywood, 118 Ill. 2d at 274, 515 N.E.2d at 50; 720 ILCS 5/12-17(a) (West 2004); see also Roberts, 182 Ill. App. 3d at 318, 537 N.E.2d at 1084 (characterizing consent as a defense but not as an affirmative defense). Section 12-17(a) of the Code provides as follows:

> "(a) It shall be a defense to any of-
> fense under [s]ection 12-13 through 12-16 of
> this Code [(720 ILCS 5/12-13 through 12-16
> (West 2004))] where force or threat of force
> is an element of the offense that the victim
> consented. 'Consent' means a freely given
> agreement to the act of sexual penetration or
> sexual conduct in question. Lack of verbal
> or physical resistance or submission by the
> victim resulting from the use of force or
> threat of force by the accused shall not
> constitute consent. The manner of dress of

the victim at the time of the offense shall not constitute consent."  720 ILCS 5/12-17(a) (West 2004).

If the defendant raises the defense of consent, "the State has a burden of proof beyond reasonable doubt on the issue of consent as well as on the issue of force."  Haywood, 118 Ill. 2d at 274, 515 N.E.2d at 50.

In its brief, the State concedes that R.H. "implicitly consented to some sort of penetration by allowing defendant to undress her, to spread her legs apart, and to position herself between [R.H.'s] legs."  We agree with that concession.  When defendant sexually penetrated R.H. by inserting her fingers or hand into R.H.'s vagina, she did so with R.H.'s consent--and, therefore, not by "force," as that term is defined in section 12-12(d) of the Code (720 ILCS 5/12-12(d) (West 2004)).  One may infer that in performing the act of penetration, defendant was--as she admitted in one of her letters--"to[o] rough when [she] should have been gentle."  Nevertheless, R.H. consented to the penetration itself; therefore, defendant did not accomplish the penetration by overcoming R.H.'s will with force or the threat of force.

The State contends this is a case of postpenetration aggravated criminal sexual assault.  On July 25, 2003, the General Assembly passed Public Act 93-389 (Pub. Act 93-389, §5,

eff. July 25, 2003 (2003 Ill. Laws 2872, 2872-73)), adding subsection (c) to section 12-17 of the Code (720 ILCS 5/12-17 (West 2004)).  Section 12-17 is entitled "Defenses," and (as we have discussed) subsection (a) provides that consent is a defense to criminal sexual assault and to other sex crimes in which force or the threat of force is an element.  720 ILCS 5/12-17(a) (West 2004).  Subsection (c) limits or clarifies the defense in subsection (a) by making the consent effective only up to the withdrawal of consent:  "A person who initially consents to sexual penetration or sexual conduct is not deemed to have consented to any sexual penetration or sexual conduct that occurs after he or she withdraws consent during the course of that sexual penetration or sexual conduct."  720 ILCS 5/12-17(c) (West 2004).

In the minds of some commentators, the concept of withdrawal of consent makes the element of force problematic.  In re John Z., 29 Cal. 4th 756, 764, 60 P.3d 183, 188, 128 Cal. Rptr. 2d 783, 789-90 (2003) (Brown, J., dissenting); N. Walsh, The Collusion of Consent, Force, & Mens Rea in Withdrawal of Consent Rape Cases: The Failure of In re John Z., 26 Whittier L. Rev. 225, 252 (2004); J. Emlen, A Critical Exercise in Effectuating "No Means No" Rape Law, 29 Vt. L. Rev. 215, 248 (2004); Note, Acquaintance Rape & Degrees of Consent:  "No" Means "No," But What Does "Yes" Mean?, 117 Harv. L. Rev. 2341, 2363 (2004). If, initially, A sexually penetrates B with B's consent (and,

therefore, without force) but merely remains inside of B after B says, "Stop, I don't want to do this any longer," where is the force?  "To prove the element of force is implicitly to show nonconsent" (Haywood, 118 Ill. 2d at 274, 515 N.E.2d at 50); but, in a case of postpenetration criminal sexual assault, it is unclear that proving the withdrawal of consent implicitly proves force.  One writer has drawn a distinction between "[p]ostpenetration rape [as] a doctrine of unwanted sex" and "prepenetration rape [as] a doctrine of forced sex."  117 Harv. L. Rev. at 2363.  Another writer argues:  "[O]nce the victim unequivocally revokes consent, the force required to accomplish continued penetration is sufficient to complete the crime."  A. Davis, Clarifying the Issue of Consent: The Evolution of Post-Penetration Rape Law, 34 Stetson L. Rev. 729, 757 (2005). The question is whether mere persistence in sexual penetration, after the withdrawal of consent, can serve as a "proxy" for force (117 Harv. L. Rev. at 2363), considering that "force" must be something more than the force inherent to sexual penetration (Haywood, 118 Ill. 2d at 274-75, 515 N.E.2d at 50-51; Kinney, 294 Ill. App. 3d at 908, 691 N.E.2d at 870-71).  See State v. Robinson, 496 A.2d 1067, 1070 (Me. 1985) ("We emphasize that the ongoing intercourse, initiated[,] we here assume[,] with the prosecutrix's consent, did not become rape merely because she revoked her consent.  It became rape if and when the prosecutrix

thereafter submitted to [the] defendant's sexual assault only because '[force or the threat of force made her] unable to physically repel the [defendant] or [too frightened to do so]'").

Perhaps, as a practical matter, this question will seldom arise because if B wishes to have sex no longer, B will surely disengage if he or she is able to do so, and if, by his or her physical posture, A prevents B from disengaging--for example, by continuing to lie on top of B (John Z., 29 Cal. 4th at 760, 60 P.3d at 185, 128 Cal. Rptr. 2d at 786)--A thereby forces B to continue with the sexual penetration.  In John Z., 29 Cal. 4th at 759, 60 P. 3d at 185, 128 Cal. Rptr. 2d at 786, for example, the California decision that inspired section 12-17(c) (720 ILCS 5/12-17(c) (West 2004)) (T. Bohn, Yes, Then No, Means No: Current Issues, Trends, & Problems in Post-Penetration Rape, 25 N. Ill. U. L. Rev. 151, 164-65 (2004)), the defendant constrained the victim to continue with sexual penetration, when she was on top of him, by grabbing her hips and pulling her back down when she tried to pull away.  Then he rolled her over so he was on top of her.  John Z., 29 Cal. 4th at 759, 60 P.3d at 185, 128 Cal. Rptr. 2d at 786.  "'No,'" she said, "'I need to go home,'" but he persisted in sexual intercourse for another minute or minute and a half, all the while asking for more time.  John Z., 29 Cal. 4th at 760, 60 P.3d at 185, 128 Cal. Rptr. 2d at 786.  The victim testified:  "'[H]e just stayed inside of me and kept like basi-

cally forcing it on me.'" John Z., 29 Cal. 4th at 760, 60 P.3d at 185, 128 Cal. Rptr. 2d at 786. In affirming the conviction, the Supreme Court of California held: "[T]he offense of forcible rape occurs when, during apparently consensual intercourse, the victim expresses an objection and attempts to stop the act and the defendant forcibly continues despite the objection." (Emphasis added.) John Z., 29 Cal. 4th at 760, 60 P.3d at 185, 128 Cal. Rptr. 2d at 786. She no doubt felt "forced" in both positions--not only when the defendant grabbed her hips and pulled her down but also when he was on top of her. One can, in a manner of speaking, passively force someone to continue with the sex act by using one's own bodily inertia to prevent the partner from disengaging. This would be force beyond that inherent to the sex act itself.

One may reasonably infer that R.H. pushed defendant because disengagement was, for her, physically impossible until defendant withdrew. Defendant withdrew when R.H. pushed her a second time. If an aggravated criminal sexual assault happened at all, it happened during the very short duration between the first and second push, when defendant, by not moving, prevented R.H. from immediately disengaging. Even though, subjectively, R.H. no longer consented, her withdrawal of consent was ineffective until she communicated it to defendant in some objective manner (see People v. Carlson, 278 Ill. App. 3d 515, 520, 663

- 30 -

N.E.2d 32, 36 (1996)) so that a reasonable person in defendant's circumstances would have understood that R.H. no longer consented (see Kinney, 294 Ill. App. 3d at 908, 691 N.E.2d at 871). Defendant used force on R.H. only if the first push operated as an objective withdrawal of consent.

Looking at the evidence in a light most favorable to the State, we conclude that no rational trier of fact could find, beyond a reasonable doubt, that a reasonable person, in defendant's circumstances, would have understood that initial push as a withdrawal of consent. See People v. Schott, 145 Ill. 2d 188, 203, 582 N.E.2d 690, 697 (1991). According to a letter from defendant that the State presented at trial, R.H. was capable of talking ("I swear to you that I did not hear you say no"). R.H.'s excuse was that she did not want to wake the children by screaming. Even if one credited that excuse, it would not solve the problem of an uncommunicated withdrawal of consent. R.H. could have said no--and, evidently, defendant expected her to say no, or at least say something, if she wanted defendant to stop the sexual penetration. This expectation seems reasonable. R.H. did not say no or stop. Instead, she pushed defendant. The problem is, people push one another during sexual congress. We do not mean to suggest that a push can never signify nonconsent or a withdrawal of consent. In fact, the second push here was clearly made with enough force to both be distinguished from a

- 31 -

caress and to effectively communicate the withdrawal of consent. "'Force' and 'consent' simply do not have static meanings. The significance of various factors--a cry for help, level of resistance, attempt to escape--depend[s] on the circumstances of each case." Kinney, 294 Ill. App. 3d at 909-10, 691 N.E.2d at 871 (Knecht, J., specially concurring). Under the circumstances of this case, a single push to the shoulders, without more, cannot serve as an objective communication of R.H.'s withdrawal of consent.

## III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment.

Reversed.

McCULLOUGH, J., concurs.

TURNER, J., dissents.

JUSTICE TURNER, dissenting:

I respectfully dissent.

When a defendant challenges the sufficiency of the evidence, the reviewing court does not retry the defendant. People v. Janik, 127 Ill. 2d 390, 401-02, 537 N.E.2d 756, 761 (1989). The jury possessed the responsibility to choose between competing versions of fact, assess the witnesses' credibility, draw inferences from the evidence, and decide whether the evidence as a whole ultimately proved defendant to be guilty of the charged offense beyond a reasonable doubt. See Janik, 127 Ill. 2d at 401, 537 N.E.2d at 761; People v. Anderson, 325 Ill. App. 3d 624, 634, 759 N.E.2d 83, 92 (2001). To avoid intruding upon the jury's prerogative as the finder of fact, we are to use a

deferential standard of review. See Janik, 127 Ill. 2d at 401, 537 N.E.2d at 761. Thus, looking at all the evidence in a light most favorable to the prosecution, we address whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Anderson, 325 Ill. App. 3d at 634, 759 N.E.2d at 92.

A rational trier of fact could have found (1) the first push sufficiently informed defendant of R.H.'s withdrawal of consent and (2) defendant did not immediately disengage. It is a reasonable conclusion defendant wrote all of the letters following the September 27, 2004, incident. In these letters, she confesses wrongdoing, deplores the "scary side" of herself, admits that she "get[s] mean sometimes," and asks R.H. if she is going to "send [her] to jail." The jury could have reasonably inferred defendant knew, from the start, at the very moment of penetration, she was being "way to[o] rough" and that when R.H. first pushed her (signifying her withdrawal of consent), defendant already knew she did not consent to this violent manner of penetration. Because someone had once done the same thing to defendant (as she revealed in People's exhibit No. 2), defendant knew she was inflicting excruciating pain upon R.H. and that the first push meant "Stop!" Nevertheless, she continued ramming her hand into R.H.'s vagina until R.H. succeeded in pushing her away. Looking at the evidence in a light most favorable to the prosecu-

tion, I conclude a rational trier of fact could have found the elements of aggravated criminal sexual assault beyond a reasonable doubt.