NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241593-U

NO. 4-24-1593

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 25, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| ANGELINA M. AVILES, | ) | No. 24CF318 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Harris and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court reversed and remanded, finding the circuit court erred in
denying defendant pretrial release.

¶ 2        Defendant, Angelina M. Aviles, appeals the circuit court's order denying her

pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725

ILCS 5/art. 110 (West 2022)), hereinafter as amended by Public Act 101-652, § 10-255 (eff. Jan.

1, 2023), and commonly known as the Pretrial Fairness Act (Act). See Pub. Act 102-1104, § 70

(eff. Jan. 1, 2023) (amending various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248,

¶ 52 (setting the Act's effective date as September 18, 2023). On appeal, defendant argues (1) the

court erred in finding the State proved by clear and convincing evidence she committed a

detainable offense and (2) no less-restrictive conditions would mitigate any threat she posed. We

reverse and remand.

¶ 3                                    I. BACKGROUND

¶ 4        On November 25, 2024, the State charged defendant by information with two counts of criminal sexual assault as a Class 1 felony (720 ILCS 5/11-1.20(a)(1) (West 2022)). The information alleged defendant used her fingers and tongue to sexually penetrate M.S.'s vagina "through force or threat of force." On the same day, the State filed a detention petition, and the circuit court conducted a hearing.

¶ 5        To establish probable cause, the State proffered officers spoke with M.S. at approximately 10 p.m. on November 23, 2024, and she stated she had been sexually assaulted by defendant. M.S. elaborated her boyfriend and defendant were at M.S.'s house that evening, all of whom were drinking and dancing. Defendant and M.S. "ended up on the couch," at which point defendant "began feeling [her] up." M.S. told defendant to stop, but defendant continued. According to the proffer, defendant "helped pull down" M.S.'s pants and began performing oral sex on her. Defendant used her tongue and fingers to penetrate M.S.'s vagina. M.S. told defendant to stop multiple times, but defendant continued "until [M.S.] actually was able to push the defendant away," at which point defendant finally stopped.

¶ 6        M.S. then confronted defendant. According to the State, M.S. video-recorded the confrontation, but the video was not played during the hearing. The State described the video's contents thusly:

> "In that recording, the defendant acknowledged saying, I know that you said, no, but I don't usually, when it comes, the last female I had said, no, but she actually liked it. [M.S.] said, indicated, I said, no, I was telling you I didn't want it. The defendant acknowledges, yeah, that's true. She also says that she thought that it

- 2 -

was something [M.S] needed. She apologized, said she was sorry. [M.S.] said, indicated I told you to stop; and she says, I liked it because I haven't had another female in so long, it felt good to have a female. And [M.S.] indicates, but what did it mean to you when I said stop, nothing?"

The circuit court found the State established probable cause, and the matter proceeded to a detention hearing.

¶ 7        In support of its detention petition, the State submitted the pretrial investigation report, which showed defendant scored a 2 out of 14 on the Virginia Pretrial Risk Assessment Instrument-Revised (VPRAI-R), which qualified her as a level 1 risk to reoffend. Defendant's criminal history consisted of a 2017 misdemeanor conviction for driving on a suspended license, for which she received 12 months of court supervision. According to defendant's mother, defendant "has a learning disability and has the cognitive level of a 15 or 16 year old."

¶ 8        The State also proffered the following regarding the county's pretrial services unit:

> "In Livingston County [the Office of Statewide Pretrial Services (OSPS)] is a two-person unit who monitor roughly between 70 to a [*sic*] 100 clients. They can meet with them in person or via phone, and they meet as often as the court orders them to.
>
> In regards to monitoring services that OSPS offers, they offer either [Secure Continuous Remote Alcohol Monitoring (SCRAM)] or GPS. They don't have any other monitoring services such as, well, any other monitoring services. In regards to GPS, GPS is a device that they can place on them that will let them know where the defendant is. They can put barriers on it, like letting them know

where not to go. That would alert them if they went somewhere they weren't supposed to. If there was a violation of the GPS monitoring, that violation would get reported from the company to OSPS who would then file a report to report the violation to the Court. So, that does take some time. SCRAM works in a similar way in that if SCRAM were ordered and there was a violation on the SCRAM device, then that would get reported to OSPS for them to file and report to the Court.

Other than that, most of the rest of the reporting that OSPS has to monitoring is self-reported meaning that the defendant would have to report any violations herself; such as, if this Court ordered no contact or ordered anything else that would require the defendant to be monitored in some sense, then it would be up to OSPS to inquire with the defendant and it would totally be dependent on the defendant being honest.

OSPS has no way to monitor in regards, they don't do home visits, they don't do work visits, they don't have any way to monitor no contact. If there was something that rose to the level of needing law-enforcement involvement, of course they could call law enforcement; but other than that, they don't have any enforcement powers."

¶ 9 The State argued detention was appropriate because defendant was charged with a detainable offense, the sexual contact at issue was not consensual, and defendant acknowledged she continued to sexually penetrate M.S. after she heard M.S. saying "no" and "stop," such that M.S. had to push defendant off her to make defendant stop. The State asserted defendant was dangerous because she forced herself onto M.S., and "but for [M.S.] being able to push the

defendant off of her, who knows where this would have gone." The State noted the video indicated defendant admitted to treating another unnamed victim similarly. The State insisted it was "dangerous to have individuals who are out in the community who do essentially what they want to do without respecting the person of other individuals." The State acknowledged defendant did not have an extensive criminal history but argued detention was proper based on the seriousness of the charged offense, the forceful nature of the act in question, and the inability of less-restrictive conditions to mitigate defendant's dangerousness.

¶ 10 According to defense counsel, defendant insisted the encounter was consensual. Counsel proffered M.S. turned off the cameras in her residence and voluntarily sat on the couch with defendant. When officers asked M.S. whether she or defendant removed her pants, M.S. stated "it was a combination" of the two. Counsel noted defendant scored a 2 out of 14 on the VPRAI-R, and her only prior conviction was a misdemeanor for which she received court supervision. Finally, counsel argued defendant was not a danger or threat to anyone, and she would abide by any conditions imposed by the circuit court.

¶ 11 The circuit court granted the petition to deny pretrial release, finding the State proved by clear and convincing evidence defendant committed a detainable offense, she posed a significant danger to M.S., and no combination of available pretrial release conditions would "adequately mitigate the high risk of threat to this victim." The court stated it considered all relevant statutory factors and the evidence presented, including the parties' arguments and the pretrial investigation report. The court observed the nature of the charges was "of utmost seriousness." The court noted, per the State's proffer, the video indicated defendant heard M.S. saying "no" and telling her to stop, but defendant "chose to ignore that and continue with the assault." The court further emphasized the video included defendant saying this was not the first

time she persisted with sexual contact after being told "no," which suggested defendant "has a history of engaging in this type of behavior." While the court acknowledged there was a concern for the safety of other potential victims, it stated it was "more concerned in this case about the contact with this particular victim."

¶ 12 The circuit court concluded "the victim's safety simply cannot be meaningfully achieved with the currently available conditions of pretrial release." In reaching this conclusion, the court asserted the following regarding OSPS:

> "The question is whether or not there are conditions of pretrial release or a combination thereof that could mitigate the real and present threat to the safety of the endangered persons. While I appreciate that OSPS *** does the best that they can, there is, as noted in the proffer from the State, I would say their caseload is very high, there's an inability to meaningfully monitor any conditions that this Court could place on this defendant. For example, a no-contact order could be put in place and the defendant could be placed on GPS. The concern I have is that it's really impossible for OSPS to monitor these conditions. I do acknowledge that the defendant scored a 2 on the VPRAI[-R], which would mean minimal contact under normal circumstances; but even if this Court ordered more frequent contact, I do not think that would be sufficient. And really I think the State summed it up best when they said that they can't, OSPS cannot protect the victim or monitor in advance such that they can prohibit the contact, they merely can find out about the contact after the fact. And given how serious these charges are and the possible penalties for these charges, it is a concern that this defendant would reach out to the victim."

The court further described OSPS's limited ability to enforce pretrial release conditions:

"So, the pretrial officer confirms any compliance by phone call or the defendant would appear in their office; but the pretrial officer does not do home visits or unannounced visits because that's too dangerous. The pretrial officer has no way to monitor or confirm the restrictions that this Court would place on the defendant, again, such as the no-contact with the victim, no social media, no drinking. In this particular case, there may be restrictions that would be appropriate given that it is a sex-assault case. There may be other restrictions such as where the defendant lives or where the defendant would go.

Further, while the pretrial officer can conduct an alcohol screen for example or even have this defendant placed on SCRAM, there's really nothing that is done when there's a violation. The violation is memorialized probably several days later and then it is put in report that goes into the defendant's file and then is brought to the Court's attention. In the meantime, the violation has occurred. And while that violation could be as innocent as a text, it could be as serious as an in-person contact which involved further violence. There's no way of knowing that and, more importantly, no way of monitoring that. And although OSPS can place this defendant on some type of home confinement or electronic monitoring, that does not prevent this defendant from communicating with the victim, being on social media or consuming of alcohol. Electronic monitoring merely tells the Court where the defendant is at, not what she is doing or, more importantly, who she is doing it with. And, again as noted, violations are reported after the fact. OSPS does not have any ability to enforce any restrictions that this

Court could impose. And given the nature and circumstances of the charges, that would be an important component of any pretrial release."

¶ 13    On December 2, 2024, defendant filed a motion for relief pursuant to Illinois Supreme Court Rule 604(h)(2) (eff. Apr. 15, 2024), which the circuit court denied after a hearing.

¶ 14    This appeal followed.

¶ 15                                    II. ANALYSIS

¶ 16    On appeal, defendant argues the circuit court erred in finding the State proved by clear and convincing evidence (1) she committed a detainable offense and (2) no less-restrictive conditions could mitigate the threat she posed.

¶ 17    Under the Code, it is presumed all criminal defendants are entitled to pretrial release, subject to certain conditions. 725 ILCS 5/110-2(a) (West 2022). The State may seek a defendant's pretrial detention if the defendant is charged with a detainable offense as enumerated in the Code and, after a hearing, the circuit court finds the defendant's release would present "a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case" or the defendant "has a high likelihood of willful flight to avoid prosecution." 725 ILCS 5/110-6.1(a)(1), (8) (West 2022). The State bears the burden of proving "by clear and convincing evidence that any condition of [pretrial] release is necessary." 725 ILCS 5/110-2(b) (West 2022). When the parties proceed solely by proffer during a detention hearing, we review the circuit court's detention determination *de novo*. *People v. Morgan*, 2025 IL 130626, ¶ 54.

¶ 18    First, defendant argues the State failed to show the proof was evident or presumption great she committed criminal sexual assault because the State's proffer did not

- 8 -

allege the encounter involved force or the threat of force. "A person commits criminal sexual assault if that person commits an act of sexual penetration and *** uses force or threat of force." 720 ILCS 5/11-1.20(a)(1) (West 2022). "Force" includes, but is not limited to, instances where "the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11-0.1 (West 2022). The record shows M.S. was on a couch when defendant began "feeling [her] up," pulled down M.S.'s pants, and used her fingers and tongue to penetrate M.S.'s vagina. Despite M.S.'s repeated efforts to make defendant stop, defendant persisted until M.S. managed to push her away. While the State's proffer does not suggest defendant employed "superior strength or size," it is reasonable to conclude defendant's position physically restrained M.S., as defendant refused to end the encounter until M.S. "actually was able to push the defendant away." Based on this proffer, the circuit court did not err in finding the State showed by clear and convincing evidence the proof was evident or the presumption great defendant committed a detainable offense. See 725 ILCS 5/110-6.1(e)(1) (West 2022).

¶ 19　　　　　Defendant's argument to the contrary relies on *People v. Denbo*, 372 Ill. App. 3d 994, 1006 (2007), in which we reversed the defendant's aggravated criminal sexual assault conviction because the victim, R.H., initially provided implicit consent to a sexual encounter "by allowing the defendant to undress her, to spread her legs apart, and to position herself between [the victim's] legs." As the encounter progressed, the defendant's conduct caused R.H. physical pain, and she withdrew her consent by pushing the defendant. *Denbo*, 372 Ill. App. 3d at 996-97. The defendant stopped after R.H. pushed her a second time. *Denbo*, 372 Ill. App. 3d at 997. We concluded "no rational trier of fact could find, beyond a reasonable doubt, that a reasonable person, in [the] defendant's circumstances, would have understood that initial push as a

withdrawal of consent." *Denbo*, 372 Ill. App. 3d at 1008. This case is distinguishable. While the *Denbo* victim withdrew her consent after the penetration occurred, M.S. told defendant to stop when defendant began touching her on the couch, before any penetration began. Indeed, M.S. told defendant to stop "[t]hroughout this encounter" and immediately confronted and videoed defendant after the contact stopped. In *Denbo*, the victim withdrew her consent during what began as a consensual sexual encounter. See *Denbo*, 372 Ill. App. 3d at 996-98. Here, in contrast, the interaction was not consensual, as M.S. told the defendant to stop both before and during the penetration.

¶ 20　　　　　Defendant also argues the circuit court erred in finding less-restrictive conditions would not mitigate her dangerousness, asserting the court "focused almost entirely on generalized claims about the ineffectiveness of [OSPS]." The record shows the court, in finding defendant dangerous, considered the seriousness of the charged offense, defendant's statements suggesting she had a history of similar conduct, and the presence of an identified person whose safety defendant threatened. See 725 ILCS 5/110-6.1(g)(1), (3), (4) (West 2022). The court also considered defendant scored a 2 on the VPRAI, indicating she presented a low risk of reoffending. The record revealed defendant suffers from a learning disability, and her cognitive function is significantly lower than her age. The events from which the charges arose took place when defendant was drinking and dancing at the residence of M.S. and her boyfriend. Considering M.S. complained of defendant's actions to law enforcement, it is reasonable to believe those circumstances are not likely to reoccur. However, the court's discussion of potential pretrial release conditions focused primarily on OSPS's limited enforcement capabilities rather than the specific circumstances of this case. Detention decisions must be individualized, and broad generalizations regarding OSPS's effectiveness are not sufficient to

support the denial of pretrial release. See 725 ILCS 5/110-6.1(f)(7) (West 2022); *People v. Atterberry*, 2023 IL App (4th) 231028, ¶¶ 16-19. Further, conditions could be imposed to make their reoccurrence even less likely. In addition to SCRAM and GPS monitoring, the court has at its disposal no-contact orders, orders of protection, and other restrictions, any of which could be imposed on defendant as a condition of her release. Because the court relied on OSPS's general enforcement limitations to find no less-restrictive conditions would mitigate the threat defendant posed, rather than tailoring its decision to the case at hand, its detention determination was not individualized to defendant's circumstances. See 725 ILCS 5/110-6.1(f)(7) (West 2022); see also *Atterberry*, 2023 IL App (4th) 231028, ¶ 18 ("[A] court should not rule out pretrial release for a defendant based on a general perception that conditions of release are loosely monitored."); *People v. Post*, 2024 IL App (4th) 241002-U, ¶ 28; *People v. Kay*, 2025 IL App (4th) 241333-U, ¶ 29. Accordingly, we remand the matter for a new hearing to allow the court to give the requisite individualized consideration to pretrial release conditions to determine whether there are any conditions or combinations of conditions that might mitigate defendant's dangerousness to M.S. and others in the community. See *Atterberry*, 2023 IL App (4th) 231028, ¶ 22.

¶ 21                                III. CONCLUSION

¶ 22          For the foregoing reasons, we reverse the circuit court's judgment and remand for a new hearing consistent with this order.

¶ 23          Reversed and remanded.