2023 IL App (2d) 220344-U
No. 2-22-0344
Order filed July 18, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20-CF-1514 |
| ANDRES LEYVA, | ) ) ) | Honorable Patricia S. Fix, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Birkett and Kennedy concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The State proved the force element of sexual assault and aggravated sexual assault with evidence that the victim was too inebriated to effectively resist the sexual acts.

¶ 2     Following a bench trial, defendant, Andres Leyva, was convicted of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2020)) and aggravated criminal sexual assault (*id.* § 11-1.30(a)(2)). He was sentenced to 6 years' imprisonment for criminal sexual assault and a consecutive 10 years for aggravated criminal sexual assault. In this timely filed appeal, defendant argues that he was not proved guilty of either offense beyond a reasonable doubt. More

specifically, he contends that the State failed to prove beyond a reasonable doubt that he committed these offenses using force. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On September 19, 2020, defendant was charged with one count of criminal sexual assault and one count of aggravated criminal sexual assault. The criminal-sexual-assault charge alleged that defendant "by the use of force committed an act of sexual penetration with R.M., [the victim,] in that the defendant placed his penis in the mouth of R.M." The aggravated-criminal-sexual-assault charge alleged that "by the use of force the defendant placed his penis in the sex organ of R.M. and in doing so caused bodily harm to R.M."

¶ 5      The uncontested evidence presented at trial revealed that R.M., age 57, lived in a single-family home with her father, age 84. R.M. helped care for her father, who had health issues. Victoria Hill and defendant, Hill's 29-year-old boyfriend, lived next door to R.M. The neighbors frequently socialized in each other's backyards. R.M. was very friendly with Hill and defendant. Although R.M. would kiss defendant and Hill on the cheeks and hug them, any attraction she felt toward the couple was platonic.

¶ 6      On the early evening of September 18, 2020, R.M., Hill, and defendant were drinking while listening to music and sitting around Hill's firepit. Late into the evening, R.M. started feeling unwell. She testified that she felt "gut sick" and that "[her] whole body was sick." R.M. believed that the alcohol she consumed caused her to feel unwell. R.M. told Hill and defendant that she needed to go home. R.M. stood up to leave but could not walk on her own. Hill and defendant helped R.M. walk to her back deck.

¶ 7      When they arrived near the unlocked sliding glass door by R.M.'s back deck, Hill left to take care of some personal matters. Defendant escorted R.M. into her home and to her bedroom.

¶ 8    The evidence was contested on what occurred between defendant and R.M. inside her home. According to R.M., defendant pulled back her bedspread and sheets. He then sat her down on the bed and pushed her back. R.M. testified that the room started spinning. Defendant then put R.M.'s hand on his penis. R.M. "couldn't do anything" to prevent this because "[she] was out of it." R.M. then "found [herself] on the other side of [her] bed, and [defendant] put his [erect] penis in [her] mouth and told [her] to suck it." R.M. stated that defendant, who was "rough" with her, "forced" his penis into her mouth, "holding [her] head and pushing [her head] towards him." R.M. elaborated that defendant "had his hands around [her] head" and "kept pushing [her] head," "cramming" his penis in her mouth and to the back of her throat. R.M. described this pushing as "painful" and "hurting." R.M. did not cry out to her father, who was soundly asleep in the next room with the television on, because she was scared and "couldn't fight [herself] off." R.M. reiterated that she was "out of it" and "would of [stopped defendant] if [she] could of." When defendant failed to orgasm, he pulled R.M. to the end of the bed. R.M., who was "nauseated terribly," attempted to fight defendant. She unsuccessfully attempted to push defendant away from her using both hands. "[Defendant] pulled [R.M.'s] pants down, put [her] legs up in the air, pulled his pants down, and placed his penis in [her] vagina." Defendant "kept trying to thrust," "pushing [his penis] in and pushing it in." R.M. "was just fighting back with some kind of Kegel movement[,] trying to keep [defendant] out." R.M., who was postmenopausal and used a prescription cream thrice weekly to combat vaginal dryness, described the penetration as "[e]xcruciating." The doorbell rang. Defendant withdrew his penis. He pulled his pants on and told R.M. not to tell Hill what had happened. Hill then walked into the house. Hill helped R.M. to her bedroom, where she began "vomiting profusely." Defendant and Hill remained with R.M. until

she stopped vomiting. Because she was frightened of defendant, R.M. did not tell Hill what defendant did.

¶ 9    R.M. testified that she passed out when defendant and Hill left her home. When she woke up the next day, she "knew [she] had been raped." She went to the hospital in the same clothes she had worn the night before and was examined by Chenel Vandenberk, a sexual assault nurse examiner. R.M. was in too much pain for Vandenberk to use a speculum during the examination.

¶ 10   Defendant gave a contrary account of what occurred between him and R.M. inside her home. R.M., who was "heavily intoxicated" and "gone," sat on her bed and thanked defendant for helping her. She reached up to hug defendant, which was her custom "[a]t every greeting or departure." R.M., who had flirted with defendant before, leaned in and kissed defendant on the cheek and lips. Defendant "kissed her back." He "didn't stop it." The two began French kissing. R.M. reached her hand into defendant's pants and began stroking his penis. Defendant then put his hand in R.M.'s pants and asked her to fellate him. R.M. did so. Defendant denied that he "thrust" his penis in R.M.'s mouth. He withdrew before he orgasmed and left the bedroom to lock the sliding glass door, as he did not want Hill to find him with R.M. When defendant returned to the bedroom, R.M. was taking her clothes off. Defendant took his clothes off. Once the two were naked, R.M. lay on her back on the bed. Defendant positioned himself between R.M.'s legs. R.M. grabbed defendant's penis and rubbed it against her vagina. "[A]fter [defendant] tried to push [his penis] in [R.M.,]" she "made a move like a little jerk reaction—like a flinch," and defendant stopped. When asked whether his "penis enter[ed] all the way into [R.M.'s] vagina," defendant said, "It did not." Defendant took the "flinch" to mean that R.M. "wasn't ready yet so [he] asked [R.M.] to perform oral sex." R.M. did so for a few minutes. Defendant again denied that he "thrust" his penis in R.M.'s mouth. Defendant heard a knock on the sliding glass door. He got dressed,

went to see who was there, and saw no one. He then heard someone at the front door. When he opened the door, Hill was there. Defendant told Hill that R.M. was "f*** up." Hill saw R.M. walking from her bedroom. Hill then left.

¶ 11    According to defendant, before he followed Hill to their home, he approached R.M., who was walking out of her bedroom and into the living room. R.M. put her hands in defendant's pants and stroked his penis. Defendant asked R.M. to fellate him. She refused. Defendant told R.M. not to say anything to Hill and went home. R.M. followed defendant out of the sliding glass door and told defendant that she wanted to talk to Hill. Defendant then went home to retrieve Hill. When he and Hill returned to R.M.'s house, R.M. was on her back deck. Hill and defendant escorted R.M. back to her bedroom. On the way, R.M. vomited in the bathroom. Hill and defendant remained with R.M. for about 45 minutes before returning home. Defendant did not tell Hill what had happened between him and R.M.

¶ 12    Hill testified that R.M. was drinking while she, Hill, and defendant socialized around Hill's firepit. Hill noticed that R.M. was "no longer *** sober" when she began slurring her words. Later, she was unsteady when she stood up to go home. Defendant helped R.M. home while Hill went inside her home. After a while, Hill went to R.M.'s home and rang the front doorbell. Defendant answered the door and said that R.M. was "f*** up." Hill saw R.M. "coming around the corner." Both defendant and R.M. were dressed. Hill went home. Later, defendant came home and said that R.M. was asking for Hill. Hill approached R.M.'s house and saw R.M. standing on her back deck. R.M. was "disheveled" and "still drunk." Defendant and Hill helped R.M. inside her house, where she began vomiting. Hill and defendant remained with R.M. until she stopped vomiting and dry heaving.

¶ 13    Vandenberk testified that R.M. was visibly upset when she first met R.M. in the examination room. Vandenberk immediately observed blood in the crotch area of R.M.'s pants. The blood was "quite noticeable." R.M., who admitted being intoxicated the night before, told Vandenberk what had happened, stating that "a penis was forced into her vagina" and also "thrust" and "pushed into her mouth."

¶ 14    Vandenberk examined the inside of R.M.'s mouth and saw an injury concentrated on the left side of R.M.'s palette and uvula. Given the concentration of the injury to one area, Vandenberk concluded that the injury was caused "more [from] a [blunt force] trauma than something organic such as an infection or cold," which results in a more uniform or bilateral redness. Although Vandenberk could not say for certain what caused the injury to R.M.'s mouth or whether the injury resulted from a consensual or nonconsensual act, she concluded that a penis thrust in R.M.'s mouth could have been the source of the injuries.

¶ 15    Vandenberk also examined R.M.'s vaginal area. When the exam began, R.M. was in a great deal of discomfort. Given R.M.'s pain level and the fact that she was postmenopausal for seven years—which affected the cushioning, elasticity, and lubrication of the vagina and vaginal area—Vandenberk did not use a speculum during the exam. Vandenberk observed a one-centimeter tear—a "pretty significant tear—"to the posterior fourchette, "which is that opening part right at the base of the entry point" of the vagina. The tear was "actively bleeding." Vandenberk also observed a hematoma, or bruise, on R.M.'s hymen, which is recessed further into the vaginal cavity. This part of the exam was "so painful" for R.M. Although Vandenberk could not say for certain what caused the injuries or whether they resulted from consensual or nonconsensual activity, she concluded that penile penetration could have been the source of the injuries.

¶ 16    Using swabs, Vandenberk collected samples from R.M.'s mouth and vagina. Vandenberk testified that urination, hygienic practices following urination, and vomiting could affect collected samples. R.M. told Vandenberk that, after the assault, she had vomited, urinated, and wiped her vaginal area.

¶ 17    Vandenberk identified photographs she took of the inside of R.M.'s mouth, her vaginal area, and her clothing. The photographs were admitted at trial and were consistent with the injuries to which Vandenberk testified. The photographs also showed blood stains on R.M.'s pants when Vandenberk saw her. The blood stain at the crotch was approximately two square inches. Additionally, on the inside leg of R.M.'s pants was an approximately two-inch line of blood.

¶ 18    Forensic testing on the material collected from R.M. did not disclose the presence of either semen or male DNA.

¶ 19    Five clips of defendant's police interrogation were admitted for impeachment purposes. In these clips, defendant stated that R.M. was "f*** hammered" and "wobbling like crazy." Although defendant admitted that he told the police that he "did not have sex" with R.M., he meant that his penis did not penetrate her vagina, not that his penis did not touch her vagina. Defendant did, however, tell the police that he and R.M. had consensual oral sex.

¶ 20    The trial court found defendant guilty of criminal sexual assault and aggravated criminal sexual assault. In doing so, the court observed that "everybody's recollection in all fairness [was] likely a little impaired like everyone was that night" and that R.M. was very upset when testifying about the assaults. The court noted that this case was "not necessarily a who-done-it"; rather, the issue was whether defendant committed the sexual acts with consent or "a knowing use of force." The court found that defendant committed the acts with a knowing use of force. In so finding, the court relied on Vandenberk's testimony and the physical evidence related to the injuries she

observed. Regarding the criminal sexual assault, the court found that the blunt force trauma Vandenberk observed in R.M.'s mouth was "consistent with [R.M.'s] testimony that [defendant] held her head, and placed his penis in [her mouth], and thrust in a forceful manner." Concerning the aggravated criminal sexual assault, the court determined that the bruise on R.M.'s hymen and the significant, actively bleeding tear of her posterior fourchette were "inconsistent with how the [d]efendant claim[ed] [intercourse] occurred" and "belie[d] the testimony of *** [d]efendant that there was not a physical entry and *** a physical force into the vagina."

¶ 21    Defendant timely moved for a new trial, arguing that he was not proved guilty of either offense beyond a reasonable doubt. The trial court denied the motion and sentenced defendant.

¶ 22    This timely appeal followed.

¶ 23                                   II. ANALYSIS

¶ 24    At issue on appeal is whether defendant was proved guilty of criminal sexual assault and aggravated criminal sexual assault beyond a reasonable doubt. When a defendant challenges the sufficiency of the evidence, the relevant question on review is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). We will not overturn a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 25    In considering whether a defendant was proved guilty beyond a reasonable doubt, it is not our function to retry the defendant. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). Rather, we must defer to the trial court, which is responsible for determining the credibility of the witnesses,

weighing their testimony, drawing reasonable inferences from the evidence, and resolving any conflicts in the evidence. *People v. Jackson*, 358 Ill. App. 3d 927, 941 (2005).

¶ 26    To prove the offenses as charged here, the State had to establish beyond a reasonable doubt that defendant committed a sexual act by using force or the threat of force. See *People v. Denbo*, 372 Ill. App. 3d 994, 1005-06 (2007); *People v. Carlson*, 278 Ill. App. 3d 515, 520 (1996); 720 ILCS 5/11-1.20(a)(1) (West 2020). In addressing whether force was used, we note that defendant raised the defense of consent below. "By proving force, the State necessarily proves nonconsent ***." *Denbo*, 372 Ill. App. 3d at 1005. On appeal, defendant concedes that the sexual acts occurred. However, he contends that he did not use force in committing the acts. He argues that the State failed to prove beyond a reasonable doubt the element of force.

¶ 27    Force requires something more than the force inherent in the act itself. *Id.* at 1007. Section 11-0.1 of the Criminal Code of 2012 (Code) (720 ILCS 5/11-0.1 (West 2020)) provides:

> " 'Force or threat of force' means the use of force or violence or the threat of force or violence, *including, but not limited to*, the following situations:
>
> > (1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or
>
> > (2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." (Emphasis added.)

¶ 28    In deciding whether force was proved beyond a reasonable doubt, "each case must be considered on its own facts." *People v. Vasquez*, 233 Ill. App. 3d 517, 527 (1992). Thus, force neither depends on "actual physical damage to bodily tissue" nor requires that "the victim physically resist before it may be said that a [sexual assault] has occurred." *People v. Nelson*, 148

Ill. App. 3d 811, 820-21 (1986). Where "resistance [would] be futile or life endangering or if the victim is overcome by superior strength or fear, useless or foolhardy acts of resistance are not required." *People v. Bolton*, 207 Ill. App. 3d 681, 686 (1990).

¶ 29    Courts addressing force in sex offense cases consider not only the size and strength of the defendant and the victim but also the location and conditions under which the assault occurred. See, *e.g.*, *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 38. Courts have held that, if the victim had the use of his or her mental faculties and physical powers, the evidence must show resistance sufficient to demonstrate that the act was against his or her will. See, *e.g.*, *People v. Walker*, 154 Ill. App. 3d 616, 625 (1987). Accordingly, the amount and intensity of resistance a victim must use diminishes with the victim's ability to exercise full mental and physical powers to resist the attacker. See *id.*

¶ 30    Here, construing the evidence in a light most favorable to the State, which we must do (see *Collins*, 106 Ill. 2d at 261), we conclude that the State proved beyond a reasonable doubt that defendant used force to assault R.M. First, concerning the criminal-sexual-assault charge, defendant, knowing that R.M. was highly intoxicated, held both sides of R.M.'s head while he thrust his erect penis into her mouth and ordered her to "suck it." Given R.M.'s highly intoxicated state, she could not stop defendant. R.M. sustained injuries to the inside of her mouth that were consistent with defendant forcing R.M. to fellate him.

¶ 31    In arguing that the State did not prove that defendant used force in committing criminal sexual assault, defendant relies on *Vasquez*. That case is distinguishable. The court in *Vasquez* found no use of force where the 13-year-old victim testified that the defendant placed his hand on the back of the victim's head and " 'forced' " him to fellate the defendant. *Vasquez*, 233 Ill. App. 3d at 519, 527-29. In so finding, the court noted that "not only would an act or acts of resistance

not have been foolish or useless, such resistance would probably have been successful" because, among other things, the evidence showed that the victim had full use of his mental and physical faculties. *Id.* at 528. Here, unlike the victim in *Vasquez*, R.M.'s intoxication prevented her from resisting. That is, the evidence, including defendant's own testimony, revealed that R.M.'s intoxication prevented her from having full use of her physical faculties to resist defendant.

¶ 32     Second, regarding the aggravated criminal sexual assault, R.M. tried to push defendant away from her. But, again, given her highly intoxicated state, she was unable to stop defendant. When defendant penetrated her, R.M. again tried to prevent the assault by performing Kegel exercises, which entailed the tightening of her pelvic floor muscles. This resistance did not stop defendant. He continued to penetrate R.M.'s vagina, causing bruising and a significant tear, which was actively bleeding when Vandenberk examined R.M. The tear also caused a sizable amount of blood to flow onto R.M.'s pants.

¶ 33     Defendant asks us to reweigh the evidence, arguing, for example, that the injuries to R.M.'s vaginal area were attributable to her postmenopausal condition. As noted, we, as a court of review, cannot reweigh the evidence. *Tenney*, 205 Ill. 2d at 428.

¶ 34     Defendant argues that absent in this case, but necessary for a finding that he used force to commit the assaults, is an "allegation of a threat" or evidence that "R.M. was confined by [defendant] or 'pinned' within a confined space, tackled, or physically prevented from leaving." In making his argument, defendant relies on *People v. Warren*, 113 Ill. App. 3d 1 (1983), to support the proposition that R.M.'s lack of effective resistance belies the trial court's finding that defendant used force in committing the offenses. We disagree. The court in *Warren* expressly stated that "*if [the] complainant had the use of her faculties and physical powers*, the evidence must show such resistance as will demonstrate that the act was against her will." (Emphasis added.) *Id.* at 6. Thus,

the amount of required resistance by the victim will depend on the victim's ability to use his or her mental and physical faculties. See *id.* Here, R.M. was extremely intoxicated, "gone," and "f***

up." In her inebriated state, the amount of resistance required was drastically diminished, as she certainly did not have effective "use of her faculties and physical powers." *Id.* R.M. confirmed as much when she testified that her meager attempts at resisting defendant were futile and that she would have stopped defendant if she could, *i.e.*, if she had use of her full mental and physical powers to do so.

¶ 35    Defendant suggests that R.M.'s "voluntary intoxication" cannot support her lack of resistance. Reiterating his argument on force, he claims that "an allegation that [R.M.] was confined by [defendant] or overcome by his superior size" was required even though R.M. was intoxicated. In making this argument, defendant loses sight of two important factors. First, defendant, a 29-year-old man, did physically overcome R.M., a highly intoxicated 57-year-old woman, and severely injure her by using his superior strength to (1) hold her head and force her to fellate him and (2) put her legs in the air, position himself over her, and repeatedly penetrate her. Second, even if the "physically overcome" prong of the definition of force in section 11-0.1 of the Code were not satisfied, that section specifically provides that "force *** include[es], *but [is] not limited to*" the two delineated types of force. (Emphasis added.) 720 ILCS 5/11-0.1 (West 2020). Even if neither type of force specified in the statute were satisfied here—a conclusion we *do not* reach—we nevertheless believe that defendant's actions met the definition of force given, among other things, R.M.'s testimony and the severity of her injuries.

¶ 36    In reaching our conclusion that defendant was proved guilty beyond a reasonable doubt of using force in committing both offenses, we recognize that defendant's account of the events contradicted R.M.'s. He suggested that R.M. initiated the sexual conduct by kissing him; that she

consented to oral sex; that he did not thrust his penis in R.M.'s mouth; and that, by removing all her clothes, grabbing his penis, and rubbing his penis in her vaginal area, she initiated sexual intercourse. Defendant's account is not dispositive. Not only was the trial court, as the judge of the witnesses' credibility, not required to accept defendant's narrative (see *People v. Kent*, 2016 IL App (2d) 140340, ¶ 18), but his account was far less probable than R.M.'s, especially given the physical evidence showing the severity of R.M.'s injuries.

¶ 37                                    III. CONCLUSION

¶ 38     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 39     Affirmed.